No. 2-22-0372
Opinion filed September 20, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-2020 |
| MICHAEL KLIMEK, | ) ) ) | Honorable David P. Kliment, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices Hutchinson and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Michael Klimek, was charged by indictment with 76 offenses related to his involvement in a "fight club" at the Illinois Youth Center in St. Charles (IYC). Defendant was charged with official misconduct (53 counts) for breaching various duties mandated by law, (*e.g.*, failing to report a battery), aggravated battery (18 counts), unlawful restraint (3 counts), theft (1 count), and mob action (1 count). Defendant moved to dismiss several of these charges, arguing that, among other things, many of the official misconduct counts did not state an offense because they (1) failed to identify the victim of the battery defendant allegedly failed to report and/or (2) charged him with violating internal rules or policies, not laws. The trial court granted the motion in part, dismissing 14 counts. Following a jury trial, where the State proceeded on 34

counts, defendant was convicted of 6 counts of official misconduct in violation of section 33-3(a)(1) and (a)(2) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/33-3(a)(1), (2) (West 2016)) and one count of aggravated battery in violation of section 12-3.05(c) of the Criminal Code (*id.* § 12-3.05(c)). Defendant filed a posttrial motion, arguing that he was not proved guilty beyond a reasonable doubt and that the trial court erred when it did not grant *in toto* his pretrial motion to dismiss the charges. The court denied the posttrial motion and sentenced defendant to 18 months' probation. In this timely filed appeal, defendant raises three issues. First, he argues that the trial court should have dismissed a count of official misconduct that charged him with failing to report the commission of a battery, as that count did not identify the victim of the battery. Second, he contends that he was not proved guilty beyond a reasonable doubt of (1) aggravated battery, official misconduct for committing a battery, and official misconduct for failing to report the commission of a battery, as the evidence did not establish that a battery occurred, and (2) official misconduct for failing to report a threat to the safety of a youth, as the evidence did not establish that the youth's safety was threatened. Third, he argues that we must reverse two official misconduct convictions because they charged him with violating internal rules or policies, not laws. We affirm.

¶ 2                                I. BACKGROUND

¶ 3     The record is voluminous. To provide a better understanding of the relevant facts, we organize them as follows.

¶ 4                            A. Pretrial Proceedings

¶ 5     The 76 counts against defendant were organized as follows by offense date: counts I to VII (January 9, 2016); counts VIII to XXVI (January 10, 2016); counts XXVII to XXXI (January 11,

2016); counts XXXII to LXIII (January 12, 2016); and counts LXIV to LXXVI (January 13, 2016). The counts named multiple victims.

¶ 6    During pretrial proceedings, defendant moved to dismiss many of the 76 counts. Counts IX, XLVI, LXXII, and LXXIII were among the counts defendant moved to dismiss. These four counts charged defendant with official misconduct. Defendant argued that counts IX, XLVI, and LXXIII "fail[ed] to state an offense in that [they] fail[ed] to allege the violation of a particular law such as would support a charge of official misconduct." Defendant challenged count IX on the additional basis that it "fail[ed] to identify the name of the alleged victim of [the] battery" defendant allegedly failed to report. Likewise, defendant challenged count LXXII for failing to name the victim of the battery defendant allegedly failed to report. In reply, the State argued that, among other things, count IX, read together with the counts with which it was "bunched together," adequately apprised defendant of the alleged victim of the battery.

¶ 7    In a two-page, three-paragraph written order, the trial court granted the motion in part and denied it in part. As relevant here, the court denied the motion as to counts IX, XLVI, LXXII, and LXXIII. The court found that the counts of official misconduct that relied on the Illinois Compiled Statutes or the Illinois Administrative Code (Administrative Code) as a basis for the charge were well pled and not subject to dismissal. The court also found that none of the official misconduct counts alleging an underlying offense (*e.g.*, battery) were required to allege the elements of that offense. The court did dismiss 14 other counts of official misconduct that were based on violations of the security procedures for the IYC (SPs). The court determined that violations of the SPs were not valid bases for the official misconduct charges because the SPs did not meet the criteria of *People v. Williams*, 239 Ill. 2d 119, 132 (2010), as they were "prescribed without any formal enactment or informal approval by a governing body."

¶ 8     Defendant then moved for a bill of particulars. The court denied the motion.

¶ 9                          B. Evidence Presented at Trial

¶ 10                          1. Challenged Convictions

¶ 11    Defendant was convicted on seven counts: counts IX, XLIII, XLVI, LXXII, LXXIII, and LXXIV, which charged defendant with official misconduct (720 ILCS 5/33-3(a)(1), (2) (West 2016)), and count LXXVI, which charged defendant with aggravated battery (*id.* § 12-3.05(c)). On appeal, defendant challenges all seven convictions except the conviction on count XLIII, which concerned the same incident as count XLVI but used a different theory. We recite only the trial evidence tailored to the six challenged convictions.

2. Defendant's Position at the IYC

¶ 12    In 2013, defendant began working for the Department of Juvenile Justice (Department) as a juvenile justice specialist (JJS) at the IYC. He previously served the Department as a JJS in a facility in Joliet. The IYC housed and provided services for incarcerated youths. The IYC was a secure facility, meaning, for example, that all doors were locked. This included the doors to the youths' rooms and the shower rooms. Only staff at the IYC, including JJSs, had keys to unlock the doors.

¶ 13    As a JJS, defendant was responsible for helping the youths with their day-to-day activities. This included waking the youths in the morning, preparing them for breakfast and school, and getting them to their recreational activities and the showers (which were locked, as noted, and also had occupancy limits). Moreover, as a JJS, defendant was expected to serve as a positive role model for the youths, encouraging them to exhibit good behavior.

¶ 14    Defendant was trained on how to fulfill his duties as a JJS. Defendant's initial and yearly training consisted of instruction on, among other things, administrative directives (ADs),

institutional directives for the IYC (IDs), the post description for JJSs at the IYC (PD), and the SPs. The ADs were derived from the Administrative Code. The Department's executive staff drafted the ADs, which governed all youth facilities in the Department. The IYC's administrative staff authored the IDs as "an add on" to the ADs, to guide JJSs on "how to do their job[s]." The IDs might differ from the internal policies of other Department youth facilities. The chief of security and the assistant superintendent of operations at the IYC drafted the PD. The IYC's assistant superintendent of operations authored the SPs.

¶ 15　The Administrative Code directed defendant to comply with departmental rules and written procedures the Department authorities issued. See 20 Ill. Adm. Code 2220.40(c) (2006). Section 2220.90(a) of Title 20 of the Administrative Code (20 Ill. Adm. Code 2220.90(a) (2006)) and the IDs required JJSs to immediately notify a supervisor, at least verbally, of any violation of a criminal law or any threat to the safety and security of any person at the IYC. Also, the ADs required JJSs to report to a supervisor any "unusual incident" involving a youth. An "unusual incident" included a youth's physical assault of another youth and any other incident that the chief administrative officer of the youth facility determined should be reported. Other incidents requiring a report included youths congregating in one of their rooms and closed-fist punching.

¶ 16　The SPs provided that JJSs could not "play with youth in such activities as baseball, basketball, ping pong, horseplay, etc." In fact, the SPs flatly prohibited "rough housing, slap boxing, horseplay, or tackle football." The PD mandated the immediate dispersal of groups of four or more youths.

¶ 17　Randall Barbee, the chief of security at the IYC, testified that he trained defendant when defendant initially came to the IYC. Upon completion of the training, Barbee and defendant signed the employee orientation form, which indicated that Barbee had instructed defendant on, among

other things, job duties, job responsibilities, and standards of conduct. After that training, defendant took an oath to, among other things, "uphold all the written and verbal orders given to [him] on the safety and security of the facility and the youth."

¶ 18    Bethany Burgert, an employee trainer at the IYC, testified that she provided yearly training for the IYC staff, including JJSs. Burgert instructed defendant on, among other things, the ADs. According to the November 2015 training verification form that Burgert and defendant signed, this training included instruction on "Mandatory Administrative Directives," such as reporting unusual incidents, and "Ethics and Professionalism," which included rules of conduct.

¶ 19    Defendant was assigned to the Pierce Cottage housing unit at the IYC. The youths housed in Pierce Cottage were grouped by gang affiliation and considered more aggressive than those housed in other cottages. The youths assigned to Pierce Cottage included A.B., E.E., R.S., N.D., M.C., L.S., X.C., D.M., and D.R. According to the trial evidence pertinent to the convictions on appeal, A.B., E.E., R.S., N.D., M.C., and L.S. were the victims of the "fight club," while X.C., D.M., and D.R. were the aggressors.

¶ 20                            3. Evidence Organized by Counts

¶ 21    We organize the evidence according to count or group of counts. Some evidence is provided out of chronological order to explain how defendant came to be charged. Each of the official misconduct counts (IX, XLVI, LXXII, LXXIII, and LXXIV) alleged that defendant violated either section 33-3(a)(1) or section (a)(2) of the Criminal Code (720 ILCS 5/33-3(a)(1), (2) (West 2016)).

¶ 22                                  a. Count XLVI

¶ 23    Count XLVI alleged that, on January 12, 2016, defendant, a public employee, committed official misconduct when he

"knowingly performed an act which he knew to be forbidden by law to perform, in violation of, 20 Ill. Adm. Code 2220.40[(c) (2006)], in that the defendant violated an [IYC]-Post Descriptive, Paragraph 26, Specific Duties, in that the defendant allowed more than two offenders access to the shower at a time."[1]

¶ 24 The trial evidence related to count XLVI revealed that the shower incident provided the impetus to investigate the "fight club" at the IYC. Ashley Ann Frank Slott, a therapist at the IYC, testified that she treated A.B., the victim of the shower incident. At his therapy session on January 14, 2016, A.B. "seemed distraught" and not "his typical self." Slott asked A.B. what was bothering him. He told her that two days earlier, on January 12, 2016, some youths entered the shower area and one attacked him. Although A.B. believed that the youths were joking around, because he was hit only about his arms and body, A.B. also said that he was so sore from the attack that he could not move his arm the next day. While A.B. relayed what happened, Slott observed bruises and scratches on A.B.'s arm. Slott considered the attack in the shower an "unusual incident," which she defined as a nonroutine occurrence or "anything *** that just doesn't sit right with you." Pursuant to the ADs, which required employees to report any "unusual incident," Slott notified her supervisor.

¶ 25 A.B. testified about the shower incident. He explained that only one youth and his roommate, if any, were allowed in the shower area at a time. Because A.B. did not have a

---

[1] Count XLVI originally cited section 2220.40(b)(3) of Title 20 of the Administrative Code (20 Ill. Adm. Code 2220.40(b)(3) (2006)), which is inapplicable. The count was amended with a citation of section 2220.40(c) of Title 20 of the Administrative Code (20 Ill. Adm. Code 2220.40(c) (2006)) prior to the trial court's ruling on defendant's pretrial motion to dismiss.

roommate, he showered alone. On the day in question, defendant unlocked the door to the shower and let A.B. in. While A.B. was in the shower with soap in his hair, he heard the door to the shower area open. Two youths came into the shower area and "jumped" him. The youths began punching A.B., so he curled up into a ball and tried to defend himself. Defendant, who was watching what was happening, did not tell the youths to stop. Because of the shower incident, A.B. was transferred from the IYC to a facility in Chicago.

¶ 26    Ricardo Marty, a supervisor of the JJSs, was eventually notified about the shower incident. He began an investigation, which entailed a review of recordings from surveillance cameras in Pierce Cottage. None of the recordings Marty collected had an audio track or was of the highest quality. Also, no cameras were in the showers or the youths' rooms.

¶ 27    During his investigation, Marty discovered recordings of the shower incident. One recording showed A.B. walking toward the shower area. Another recording showed defendant, D.M., and X.C. near the shower area. X.C. paced around and bit his nails before he took off his shirt and ran toward the shower area. D.M. followed X.C.

¶ 28    Barbee testified that the doors to a shower area must be locked when a youth is using the shower.

¶ 29    Photographs taken of A.B. after the shower incident were admitted at trial. They showed scratches, redness, or bruising on A.B.'s arm and chest. A.B. testified that he did not have these injuries before the shower incident.

¶ 30    Defendant denied any involvement in the shower incident. He stated that he was in the locked control room completing paperwork when the incident happened. Defendant testified that, if he had been aware of the incident, he would have stopped it and made a report.

¶ 31                              b. Count IX

¶ 32    Count IX alleged that, on January 10, 2016, defendant, a public officer, committed official misconduct when he

"intentionally failed to perform a mandatory duty as required by law, in violation of, 20 Ill. Adm. Code 2220.90(a) [(2006)], in that he failed to report the commission of a battery at the [IYC] Property."

¶ 33    The trial evidence related to count IX revealed that Marty, while investigating the shower incident, discovered a recording of an incident that occurred at 8:53 p.m. on January 10, 2016. In this recording, E.E. and three other youths sat in the dayroom at Pierce Cottage. Defendant and X.C. entered the room from opposite directions. X.C., a youth larger than E.E., approached E.E. and pushed him in the chest. E.E. stepped back and grabbed his chest while appearing to laugh and smile. At the same time, D.M., another youth who was larger than E.E., entered the room. D.M. approached X.C. and E.E. X.C. patted E.E. on the back and walked away. D.M. then punched E.E. in the shoulder area. E.E. retreated a bit and then stepped forward quickly, as if attempting to scare D.M. D.M. assumed a fighting stance, and E.E. walked away. Defendant stood and watched what transpired. When the fighting started, none of the other three youths in the dayroom appeared concerned about what was happening. E.E. and X.C. exited the dayroom, talking. While they stood in the hallway outside the dayroom, E.E. pointed to his throat. X.C. then punched E.E. E.E. backed up and appeared to laugh while protecting his chest area with his arms. D.M. and defendant then entered the hallway. D.M. was smiling. X.C. punched E.E. again. E.E. then stepped off-camera. X.C. and D.M. appeared to take turns punching E.E. 11 times. Another youth walked by, gesturing at what was transpiring. As X.C. and D.M. punched E.E., defendant pulled out his radio and appeared to speak into it. X.C. and D.M. stopped punching E.E., who then stepped back into the camera's view. D.M. patted E.E. on the back as E.E. walked away. D.M. then punched E.E.'s back

twice. E.E. moved forward, X.C. approached E.E., and X.C. punched E.E. three times. E.E. ran behind defendant, who was watching the action while appearing to smile and/or laugh. D.M. chased E.E. off-camera, but E.E. quickly returned to the camera's view. X.C., D.M., and defendant appeared to smile and talk while E.E. jogged past them and down the hallway.

¶ 34    Marty testified that this incident was concerning because "[X.C. and D.M.] were throwing closed-fist punches to [E.E.,] which was jeopardizing [E.E.'s] safety." Marty and Barbee testified that defendant was required to intercede either physically or verbally and stop the fighting when it was safe for him to do so. However, the recording never showed defendant taking that action. Similarly, Marty and Barbee testified that defendant was required to report the closed-fist punching of E.E., but he never did. Shaque Johnson, the JJS supervisor on duty when the incident involving E.E. occurred, confirmed that defendant never reported this incident.

¶ 35    Defendant testified that E.E., X.C., and D.M. were all friends when the dayroom incident occurred. Defendant denied that he orchestrated the incident. In defendant's view, the youths were simply "horseplaying," as he saw nothing in their demeanor to suggest they were "serious in fighting." Nonetheless, defendant decided to "deescalate" the situation, so he pulled out his walkie-talkie and told the youths that he would report a fight in progress if they did not stop. Defendant chose a verbal warning over physical intervention because he did not want to risk his own safety. Defendant agreed that he was smiling in the recording of the dayroom incident, but he claimed that this was a further effort to "deescalate" what was happening. On cross-examination, defendant vacillated over whether the youths' conduct during the dayroom incident amounted to "roughhousing," which was prohibited at the IYC. He initially admitted that he saw roughhousing in all the recordings the State introduced of the charged incidents. Later, however, although defendant acknowledged that E.E. was punched with a closed fist during the dayroom incident,

defendant still regarded the incident as horseplay because the youths "didn't do anything serious" during the incident. Defendant did not regard punching as roughhousing because he "ha[d] seen it quite often." He admitted, however, that even horseplay was prohibited at the IYC. According to defendant, roughhousing was "[v]ery common" at the IYC.

¶ 36                    c. Counts LXXII, LXXIII, LXXIV, and LXXVI

¶ 37    Counts LXXII, LXXIII, LXXIV, and LXXVI concerned events that took place on January 13, 2016.

¶ 38    Count LXXII alleged that defendant, a public employee, committed official misconduct when he

> "knowingly performed an act which he knew to be forbidden by law to perform, in violation of, 720 ILCS 5/12-3.05(c) [(West 2016)], the commission of a battery on public property being the [IYC] property."

Count LXXIII stated that defendant, a public employee, committed official misconduct when he

> "intentionally failed to perform a mandatory duty as required by law, in violation of, 20 Ill. Adm. Code 2220.90(a) [(2006)], in that he failed to report the commission of a battery on the [IYC] property."

Count LXXIV alleged that defendant, a public employee, committed official misconduct when he

> "intentionally failed to perform a mandatory duty as required by law, in violation of, 20 Ill. Adm. Code 2220.40[(c) (2006)], in that the defendant violated an Institutional Directive Standards of Conduct 03.02.108, Section 4(B)(4) by failing to report to his supervisor a threat to the safety of [N.D.]"[2]

---

[2] Like count XLVI, count LXXIV originally cited section 2220.40(b)(3) of Title 20 of the

Count LXXVI stated that defendant, a public employee, committed aggravated battery when he "knowingly made contact of an insulting or provoking nature with [N.D.], in that he struck [N.D.] about the body while on public property being, the [IYC] property."

¶ 39    Trial evidence concerning these charges revealed that Marty, while investigating the shower incident, discovered a recording of an incident that occurred at 8:33 p.m. on January 13, 2016. In that recording, D.R., D.M., and defendant stood outside N.D.'s room. D.R., who was inches away from the door, appeared to speak with N.D. through the small glass window in the door. Defendant, apparently smiling, unlocked the door to N.D.'s room. N.D.'s left hand moved from the window area. Although N.D.'s hands were now off-camera, N.D. appeared to use his left hand to brace himself as he held the door closed. Defendant pulled on the door twice before it opened. As the door opened, N.D. pushed himself away from the door. D.M., who stood behind D.R. and defendant, raised his right hand, as if motioning for something to begin. N.D., who was smaller than D.R. and D.M., appeared to smile and laugh as he backed away from the door. D.R. took off his shoes and entered the room. D.M. motioned to X.C., who jogged down the hallway toward N.D.'s room. Defendant, D.M., and X.C. stood at the door, smiling and talking as they watched what was transpiring in the room. As noted, there was no camera in the room, but some of the action inside was discernible in the hallway camera's recording. The hallway recording revealed that, at one point, D.R. pushed N.D. against a shelf in the room. N.D. pulled down a towel

Administrative Code (20 Ill. Adm. Code 2220.40(b)(3) (2006)), which is inapplicable. Count LXXIV, like count XLVI, was amended with a citation of section 2220.40(c) of Title 20 of the Administrative Code (20 Ill. Adm. Code 2220.40(c) (2006)) prior to the trial court's ruling on defendant's pretrial motion to dismiss.

laid across the shelf. N.D. appeared to lose his balance, and then D.R. apparently grabbed N.D. around the waist and brought him to the ground. The recording showed only a small portion of N.D.'s right foot as he lay on the ground. While N.D. was on the ground, D.M. ran into the room, followed by X.C., who was also bigger than N.D. D.M. punched toward the ground where N.D. lay. Defendant stood at the entrance to N.D.'s room and watched what happened inside. While the scuffle continued, X.C. threw several punches. Defendant laughed and clapped his hands as he stepped into the room. The scuffle continued. D.M. and X.C. exited N.D.'s room, and defendant remained standing just inside. D.M. and X.C. stood outside the room, apparently captivated by what was happening inside. Thereafter, an item was thrown across the floor, and D.R. threw a punch. Defendant bent down and appeared to motion quickly with his right hand, as if demonstrating a punch or throwing one. D.R. prepared to leave the room. D.M. and X.C. shook hands. D.R. exited the room, and D.M. and D.R. shook hands. D.R., D.M., and X.C. walked down the hallway as defendant kicked into the room the towel N.D. had pulled from the shelf. Defendant then closed the door to N.D.'s room. As the door closed, N.D. bent down and picked up the item that had been thrown across his floor.

¶ 40    A.B., who was in a room down the hall from N.D., testified that he could not remember what he specifically told investigators about the incident involving N.D. The State then asked A.B. if he remembered telling investigator Daniel Douglas that " '[N.D.] was like aah, aah, but [D.R., D.M., and X.C.] were like come on, come on. But then after that they came out and they were laughing or whatever.' " A.B. replied that he did not remember saying this to Douglas, but it "ma[de] sense" that he would have said it. A.B. also did not remember telling Douglas that A.B. saw bruises on N.D.'s body after D.R., D.M., and X.C. attacked N.D.

¶ 41    Douglas testified that A.B. did report during their interview that he saw bruises on N.D.'s body after the attack. Also, the State played for the jury a portion of Douglas's interview with A.B., during which A.B. stated that he saw bruises on N.D.'s body after the attack.

¶ 42    Marty testified that he found the incident involving N.D. concerning because "[s]everal youths entered [N.D.'s] room and appeared to throw closed-fist punches to his person." Because the incident directly threatened N.D.'s safety, defendant should have stopped the fight and immediately reported it to his direct supervisor. Defendant did neither. Johnson, the JJS supervisor on duty during the incident, confirmed that defendant never reported it.

¶ 43    Defendant testified that he opened the door to N.D.'s room because N.D. called out to his friends and wanted them to come in. Defendant did not feel any resistance when he opened the door. When he let the youths into N.D.'s room, all of them, including N.D., punched each other and slap-boxed. Defendant admitted that such activity among the youths at IYC was sometimes horseplay and sometimes more serious. Defendant stated that he did not orchestrate the incident with N.D. and that the youths stopped when he ordered them to do so. As noted, defendant admitted that he saw roughhousing in all recordings the State introduced of the charged incidents.

¶ 44                    3. General Details About the "Fight Club"

¶ 45    R.S. and M.C. were the only youths besides A.B. who testified at trial. While their testimony concerned incidents that are not the subject of this appeal, their testimony was nonetheless informative.

¶ 46    R.S. testified that youths' rooms were always locked and had to be unlocked by a "CO," *i.e.*, a JJS. The JJS would unlock the rooms to let "work detail[s]" in. When a work detail entered a room, the youths would fight or engage in horseplay. The fighting might involve punches. The JJS usually stood at the door to the youth's room and watched. If the horseplay got "too serious,"

the JJS would order the youths to stop. Defendant was one of the JJSs who, after unlocking the door to a youth's room, would watch the youths fight. Although the fighting was "mostly play," R.S. testified that "[s]ometimes it was [done out of] anger." Asked if horseplay during a work detail's visit "wasn't an unusual occurrence," R.S. replied, "It depended on who it was."

¶ 47 M.C. testified that horseplay and wrestling occurred at the IYC even though they were prohibited. Although "[a] lot of times [youths] would just play around," "[s]ometimes it was more than that," meaning "[s]ometimes [the youths] actually wanted to hurt someone." On one occasion, a fellow youth placed M.C. in a chokehold while on his way to the dayroom. Defendant watched but did not stop it. M.C. was "[n]ot really" insulted by the contact, but he also did not ask for or want the contact.

¶ 48 Defendant timely appealed. Additional facts pertinent to the issues raised will be discussed in the context of our analysis.

¶ 49                                    II. ANALYSIS

¶ 50 On appeal, defendant argues first that the trial court should have dismissed count IX because it alleged official misconduct for failing to report the commission of a battery yet did not identify the victim of the battery. Second, defendant contends that he was not proved guilty beyond a reasonable doubt of (1) aggravated battery (count LXXVI), official misconduct for committing a battery (count LXXII), and official misconduct for failing to report the commission of a battery (counts IX and LXXIII), because the evidence did not establish that a battery occurred and (2) official misconduct for failing to report a threat to a youth's safety (count LXXIV), because the evidence did not establish that the youth's safety was threatened. Third, he argues that we must reverse two official misconduct convictions (counts XLVI and LXXIV) because they charged defendant with violating internal rules or policies, not laws. We consider each issue in turn.

¶ 51                    A. Identity of the Battery Victim

¶ 52    Defendant argues that count IX of the multicount indictment should have been dismissed before trial when he moved to dismiss certain charges for failing to state an offense. Defendant claims that count IX, which charged him with official misconduct for failing to report the commission of a battery, is insufficient because it does not identify the victim of the battery. We review *de novo* the sufficiency of a charging instrument. *People v. Carey*, 2018 IL 121371, ¶ 19.

¶ 53    "A defendant has a fundamental right, under both the federal constitution [(U.S. Const., amend. VI)] and the Illinois Constitution of 1970 [(Ill. Const. 1970, art. I, § 8)], to be informed of the ' "nature and cause" of criminal accusations made against him.' " *People v. Davis*, 281 Ill. App. 3d 984, 987 (1996) (quoting *People v. DiLorenzo*, 169 Ill. 2d 318, 321 (1996)). In Illinois, this constitutional right is implemented by section 111-3 of the Code of Criminal Procedure of 1963 (Code of Criminal Procedure) (725 ILCS 5/111-3 (West 2016)). *Carey*, 2018 IL 121371, ¶ 20. "Section 111-3(a) imposes specific pleading requirements for criminal charges." *Id.* "These principles also apply to the predicate or underlying offense of a charged crime." *Id.* "This rule 'protects the defendant against being forced to speculate as to the nature or elements of the underlying offense, thus spreading his resources thin, attempting to rebut all of the possibilities, while the prosecutor merely focuses on the most promising alternative and builds his case around that.' " *Id.* (quoting *People v. Hall*, 96 Ill. 2d 315, 320 (1982)).

¶ 54    "The timing of a challenge to a charging instrument is significant in determining whether a defendant is entitled to reversal of his or her conviction based on charging instrument error." *Id.* ¶ 21. "If an indictment or information is challenged before trial in a pretrial motion, the charging instrument must strictly comply with the requirements in section 111-3(a)." *Id.*

¶ 55    Here, defendant challenged multiple counts of the indictment, including count IX, before trial. Thus, we must determine whether count IX strictly complied with section 111-3(a). Section 111-3(a) of the Code of Criminal Procedure (725 ILCS 5/111-3(a)(1)-(5) (West 2016)), which outlines the form of the charge, provides:

> "(a) A charge shall be in writing and allege the commission of an offense by:
>
>> (1) Stating the name of the offense;
>>
>> (2) Citing the statutory provision alleged to have been violated;
>>
>> (3) Setting forth the nature and elements of the offense charged;
>>
>> (4) Stating the date and county of the offense as definitely as can be done; and
>>
>> (5) Stating the name of the accused, if known, and if not known, designate the accused by any name or description by which he can be identified with reasonable certainty."

Defendant's specific claim under section 111-3(a)(3) is that count IX fails to "[s]et[ ] forth the nature and elements of the offense charged." *Id.* § 111-3(a)(3).

¶ 56    "Ordinarily, when the counts of an indictment follow the statutory language in setting out the nature and elements of an offense, the requirements of section 111-3 are met." *Davis*, 281 Ill. App. 3d at 987. Tracking the statutory language is acceptable when " 'the words [(in the statute)] so far particularize the offense that by their use alone [the defendant] is informed with reasonable certainty of the precise offense with which he is charged' [citation]." *Id.* at 988 (quoting *People v. Abrams*, 48 Ill. 2d 446, 459 (1971)). If "the statutory language describes specific conduct, there is no need for the charge to specify the exact means by which the conduct was carried out." *Id.* However, if the "statute does not specifically define the crime, or does so only in general terms,

the charge must go beyond the words of the statute; it must allege some act showing the statute was violated." *Id.*

¶ 57 In assessing the sufficiency of a charging instrument, "[t]he question is not whether the alleged offense could have been described with greater certainty." *Id.* at 987. Rather, the question is whether the charging instrument's allegations "described the nature and elements of the offenses in a way sufficient to enable the defendant to understand the charges and 'prepare a defense which, if successful, would bar further prosecution for the same offense.' " *Id.* at 988 (quoting *People v. Smith*, 99 Ill. 2d 467, 471 (1984)). " 'It is a well-established rule in Illinois that all counts of a multiple-count indictment should be read as a whole and that elements missing from one count of an indictment may be supplied by another count.' " *Carey*, 2018 IL 121371, ¶ 25 (quoting *People v. Morris*, 135 Ill. 2d 540, 544 (1990)). This rule applies whether the indictment's sufficiency is challenged before trial or later. *Morris*, 135 Ill. 2d at 544.

¶ 58 As noted above, count IX charged defendant with official misconduct under section 33-3(a)(1) of the Criminal Code (720 ILCS 5/33-3(a)(1) (West 2016)), which provides:

> "(a) A public officer or employee or special government agent commits misconduct when, in his official capacity or capacity as a special government agent, he or she commits any of the following acts:
>
> > (1) Intentionally or recklessly fails to perform any mandatory duty as required by law[.]"

¶ 59 Specifically, count IX alleged that, on "January 10, 2016, defendant" committed "Official Misconduct" when he

"intentionally failed to perform a mandatory duty as required by law, in violation of, 20 Ill. Adm. Code 2220.90(a) [(2006)], in that he failed to report the commission of a battery at the [IYC] Property."

¶ 60    Although count IX tracks the language of section 33-3(a)(1) of the Criminal Code, courts have determined that reciting "the official misconduct statute, without more, cannot support a valid indictment," as the statute " 'does not particularize the offense.' " *Davis*, 281 Ill. App. 3d at 988 (quoting *People v. Krause*, 241 Ill. App. 3d 394, 397 (1993)). Thus, here, the question becomes whether the State's additional allegation, that defendant "failed to report the commission of a battery at the [IYC] Property," was enough for him to understand the charge and prepare a defense that would bar further prosecution if his defense was successful.

¶ 61    Defendant argues that the additional allegation was not enough. He claims that the State should have pled the underlying offense, the battery, with more specificity, by identifying the victim of the battery. The State responds that (1) a charge of official misconduct need not allege the underlying offense with specificity and (2) the multicount indictment read in its entirety placed defendant on notice that E.E. was the victim of the battery alleged in count IX.

¶ 62    Addressing the State's second argument first, we agree that count IX and its related counts collectively notified defendant that E.E. was the victim of the battery charged in count IX. In so concluding, we find our supreme court's decision in *Carey* instructive. There, the defendant was charged with (1) one count of first degree felony murder based on attempted armed robbery, (2) one count of attempted armed robbery while armed with a firearm, and (3) two counts of unlawful use or possession of a weapon by a felon based on possession of a firearm. *Carey*, 2018 IL 121371, ¶ 3. Immediately before a jury was selected, the State nol-prossed all charges except the first degree felony murder charge. *Id.* ¶ 6. Evidence at trial revealed that the defendant and his

brother ambushed two armored truck guards. *Id.* ¶¶ 3, 8. The defendant's handgun was inoperable, and his brother was armed with a homemade object that looked like a sawed-off shotgun. *Id.* ¶¶ 10-11. The guards shot both the defendant and his brother. *Id.* ¶¶ 8-9. The defendant lived, but his brother died. *Id.* The jury found the defendant guilty of first degree felony murder. *Id.* ¶ 14. After the defendant was sentenced, he appealed. *Id.* ¶ 15. In the appellate court, he argued for the first time that he was prejudiced in preparing a defense, because the felony murder count failed to specify which attempted armed robbery offense formed the basis for the felony murder charge. *Id.* The appellate court agreed, and the State appealed to our supreme court, which determined that the indictment was sufficient. *Id.* ¶¶ 16-17, 30.

¶ 63     In so finding, the supreme court first observed that the first degree felony murder count charged that the defendant was accountable for his brother's death because the death occurred during an attempted armed robbery. *Id.* ¶ 24. The court then noted, as had the appellate court, that armed robbery is committed in one of two ways: (1) robbery while armed with a dangerous weapon other than a firearm and (2) robbery while armed with a firearm. *Id.* Although the first degree felony murder count on which the defendant was convicted did not specify which type of attempted armed robbery the defendant committed, our supreme court determined that "the indictment, read as a whole, clearly informed [the] defendant that the State intended to prove that he possessed a firearm," not that he possessed a dangerous weapon other than a firearm, "at the time of the shooting." *Id.* ¶ 26.

¶ 64     We determine that the failure to specify in *Carey* which type of attempted armed robbery the defendant committed for purposes of the first degree felony murder charge is analogous to the State's failure here to specify the victim of the battery in count IX, as the multicount indictment collectively indicates that the victim of the battery in count IX was E.E. As the State observes,

counts VIII to XIII all concerned an event that occurred on January 10, 2016. These counts charged official misconduct in committing a battery (count VIII), official misconduct for failing to report the commission of a battery (count IX), official misconduct for failing to report a threat to E.E.'s safety (count X), official misconduct for allowing youths to roughhouse and horseplay (count XI), and two counts of aggravated battery of E.E. (counts XII and XIII). We hold that these counts collectively placed defendant on notice that the victim of the battery charged in count IX was E.E.

¶ 65    In his reply brief, defendant argues that the surrounding counts did not collectively notify him of the victim of the battery charged in count IX, because other counts in the indictment also concern events that occurred on January 10, 2016. Defendant is correct insofar as counts XIV to XXVI also addressed incidents that occurred on January 10, 2016. But where counts VIII to XIII concerned E.E. as victim, counts XIV to XXVI concerned R.S. and L.S. as victims. First, counts XIV to XIX charged defendant with the same offenses as counts VIII to XIII but involved R.S., not E.E. Specifically, counts XIV to XIX, like counts VIII to XIII, charged defendant with official misconduct for committing a battery (count XIV), official misconduct for failing to report the commission of a battery (count XV), official misconduct for failing to report a threat to R.S.'s safety (count XVI), official misconduct for allowing youths to roughhouse and horseplay (count XVII), and aggravated battery of R.S. (counts XVIII and XIX).

¶ 66    Second, counts XX to XXVI charged defendant with virtually the same offenses as counts VIII to XIII and counts XIV to XIX, but the victim was L.S., not E.E. or R.S. Specifically, defendant was charged with official misconduct in committing a battery (count XX), official misconduct in committing an unlawful restraint (count XXI), official misconduct for failing to report the commission of a battery (count XXII), official misconduct for failing to report a threat to L.S.'s safety (count XXIII), aggravated battery of L.S. (counts XXIV and XXV), and unlawful

restraint of L.S. (count XXVI). Given the parallels among the charges in counts VII to XIII, XIV to XIX, and XX to XXVI, we conclude that defendant was on notice that E.E. was the victim of the battery alleged in count IX.

¶ 67    All of that said, we also believe that the State's first argument is meritorious, *i.e.*, that a charge of official misconduct need not allege with specificity the underlying act supporting the charge. Supporting our position is *People v. Samel*, 115 Ill. App. 3d 905 (1983). There, the defendant, a police officer, used the Law Enforcement Agency Data System (LEADS) to obtain the names and addresses of various vehicle owners to facilitate burglaries at the vehicle owners' homes. *Id.* at 907-08. He was charged with, among other things, 13 counts of official misconduct. *Id.* at 907. These counts provided, in relevant part, that defendant committed (1) official misconduct by "procuring *** the name and address of a specified vehicle registration number owner from LEADS for purposes other than that of law enforcement," (2) official misconduct based upon burglary by "[p]rocuring the name and address of a vehicle registration number owner from LEADS for purposes other than law enforcement," and (3) official misconduct by "procur[ing] *** the name and address of a specified vehicle registration number owner by means of a computer check through LEADS for purposes other than that of law enforcement." *Id.* at 908, 912. The defendant moved before trial to dismiss these and other counts, the court dismissed the 13 counts of official misconduct, and the State filed an interlocutory appeal. *Id.* at 907.

¶ 68    On appeal, the State's "main contention" was that a "violation of any statute, rule, or regulation, whether civil or criminal, can form the basis for conviction under sections 33-3[(a)(2)] and [(a)(3)] of the Criminal Code." *Id.* at 909. The appellate court agreed. *Id.* at 911-12. In explaining its reasons, the court rejected the defendant's argument that the indictment was insufficient because violations of LEADS regulations, which lack a penalty clause, do not

constitute criminal offenses. *Id.* The court rejected the premise that a criminal violation must be the basis for a charge of official misconduct:

> "In the present case, *** the defendant was not charged with the criminal offense of violating any LEADS regulation. Such regulation is only relevant in that it establishes the lawful obligation which the defendant is compelled to obey [citation]; it is not the offense with which the defendant was charged." *Id.* at 912.

Therefore, the court held that the trial court erred in dismissing the official misconduct charges based on the violation of LEADS regulations. *Id.* However, the court agreed that the official misconduct charges based on burglary were properly dismissed because "[p]rocuring the name and address of a vehicle registration number owner from LEADS for purposes other than law enforcement is not an act forbidden by the burglary statute." *Id.* Notably, the court in *Samel* did not mention, let alone ascribe any significance to, the fact that the official misconduct counts did not provide the specific names and addresses of the registered owners the defendant identified through LEADS.

¶ 69 Here, defendant was charged in count IX with official misconduct, not battery. Thus, the question is whether the nature and elements of official misconduct could be adequately conveyed without including the elements of battery. Under *Samel*, the answer is yes. The battery, like the LEADS violation in *Samel*, "is only relevant" because, in conjunction with the mandatory reporting requirements of the Administrative Code, it "establishes the lawful obligation which the defendant is compelled to obey [citation]." *Id.* Battery "is not the offense with which *** defendant was charged." See *id.* Moreover, defendant was not charged in count IX with official misconduct for *committing* a battery. He was charged in count IX with official misconduct for *failing to report* a violation of the law, *i.e.*, a battery. Reporting the violation is what defendant "[i]ntentionally or

recklessly fail[ed] to perform *** as required by law." See 720 ILCS 5/33-3(a)(1) (West 2016).

Thus, unlike in *Samel*, where the court determined that the official misconduct charges based on

burglary were insufficient because using "LEADS for purposes other than law enforcement is not

an act forbidden by the burglary statute" (*Samel*, 115 Ill. App. 3d at 912), count IX is sufficient

because it specifies how defendant violated the Administrative Code, *i.e.*, he *failed to report* the

battery. Finally, although not dispositive of the issue raised here, *Samel*'s failure to note that none

of the 13 counts of official misconduct named the registered owners suggests that the names or

identification of victims *in cases like this* is not necessary to state the offense of official

misconduct.

¶ 70                                    B. Reasonable Doubt

¶ 71      As noted above, defendant argues that he was not proved guilty beyond a reasonable doubt

of aggravated battery (count LXXVI), official misconduct for committing a battery (count LXXII),

and official misconduct for failing to report the commission of a battery (counts IX and LXXIII),

because the evidence did not establish that a battery occurred. Defendant also argues that he was

not proved guilty beyond a reasonable doubt of official misconduct for failing to report a threat to

a youth's safety (count LXXIV), because the evidence did not establish that there was a threat to

the youth's safety.

¶ 72      "It is well settled that, when reviewing a challenge to the sufficiency of the evidence, a

reviewing court must determine whether, after viewing the evidence in the light most favorable to

the prosecution, any rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." (Internal quotation marks omitted.) *People v. Cline*, 2022 IL 126383,

¶ 25. "All reasonable inferences from the evidence must be drawn in favor of the [State]." *Id.* "This

court will not reverse the [trier of fact's] judgment unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *Id.*

¶ 73                                     1. Battery

¶ 74    Counts IX and LXXIII charged defendant with official misconduct for failing to report the commission of a battery. Counts LXXII and LXXVI alleged that defendant was accountable for the youths' commission of battery and aggravated battery. Defendant argues that the State failed to prove beyond a reasonable doubt that a battery occurred as alleged in counts IX, LXXII, LXXIII, and LXXVI. He does not argue that the State otherwise failed to prove the elements of official misconduct. He also does not dispute that he was accountable for the youths' conduct that allegedly constituted a battery or aggravated battery. He contends that, if no battery occurred, he necessarily cannot be guilty of aggravated battery, official misconduct for committing a battery, or official misconduct for failing to report a battery.

¶ 75    A defendant commits battery in one of two ways. See *People v. Davidson*, 2023 IL 127538, ¶ 17. Specifically, a battery occurs if the defendant "knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3(a) (West 2016). A defendant commits an aggravated battery when the commission of the battery is coupled with one of several enumerated aggravating factors. *Id.* § 12-3.05. One aggravating factor is that the battery occurred on public property. See *id.* § 12-3.05(c) ("A person commits aggravated battery when, in committing a battery, other than by the discharge of a firearm, he or she is or the person battered is on or about *** public property ***.").

¶ 76    Here, defendant does not challenge the fact that the IYC is public property. Thus, we do not consider whether the State proved beyond a reasonable doubt the aggravating factor alleged in

count LXXVI. Moreover, we do not consider whether defendant committed battery predicated on bodily harm (see *id.* § 12-3(a)(1)), as (1) count LXXVI alleges only battery predicated on insulting or provoking contact, and (2) while, as noted above, the official misconduct counts do not allege the elements of battery, the parties debate only whether the State proved beyond a reasonable doubt that the contact with the victims was insulting or provoking (see *id.* § 12-3(a)(2)). According to defendant, the State's proof failed because the evidence shows that the victims were laughing and joking with the aggressors during the charged incidents. Thus, defendant argues that this apparent jovialness shows that the victims could not have been insulted or provoked.

¶ 77    Our supreme court recently addressed how to assess whether contact is insulting or provoking. In *Davidson*, 2023 IL 127538, ¶ 8, the defendant, a prison inmate, returned from court disappointed that the trial court had refused to release him from prison. He expressed his anger by screaming and swearing. *Id.* ¶ 5. A correctional officer confronted the defendant, asking the defendant to explain what had happened. *Id.* Instead of explaining, the defendant continued to scream and swear. *Id.* When the defendant failed to calm down, the officer told the defendant that he would be placed on lockdown. *Id.* The defendant responded that the officer " 'would have to make [him] go on lock down.' " *Id.* As the officer tried to physically control the defendant, he "pushed out his hands and shoved [the officer] in the chest, which caused [the officer] to take a step backwards." *Id.* ¶ 6. The officer neither was physically injured by the contact nor testified that the defendant's push insulted or provoked him. *Id.* ¶ 7. The jury found the defendant guilty of aggravated battery, and he appealed. *Id.* ¶¶ 9-10.

¶ 78    At issue before our supreme court was whether, under Illinois law, proof of insulting or provoking contact must be based on (1) the victim's subjective belief that the contact was insulting or provoking or (2) what a reasonable person would have believed under the circumstances in

which the contact occurred. *Id.* ¶ 13. The court found that the reasonable person standard controlled. *Id.* ¶ 18. Thus, "whether the victim subjectively found the contact insulting or provoking is not necessary to establish that [a] defendant committed *** battery" based on insulting or provoking contact. *Id.* ¶ 17. Rather, "it is the nature of the contact, not the actual impact on the victim, that must be established" as insulting or provoking. *Id.* ¶ 16. In reaching that conclusion, the court observed that it would be absurd to conclude otherwise, as "[t]here are many reasons why a victim may not display an emotional reaction or deny being insulted or provoked." *Id.* ¶ 18. For example, a victim of domestic violence might, for motives such as fear of retaliation or the desire to appear stoic, refuse to testify that contact was insulting or provoking. *Id.* Further, some victims might be unable to comprehend if contact was insulting or provoking. *Id.* Finally, contact with unconscious victims could not meet the subjective standard. *Id.* ¶¶ 17-18.

¶ 79 Under *Davidson*, we must conclude that the contact with the victims here, E.E. and N.D., was insulting or provoking. Although neither E.E. nor N.D. testified that he was insulted or provoked, that fact is immaterial. See *id.* ¶ 17. The question we must consider is whether, under the evidence as viewed in the light most favorable to the State, a reasonable person in E.E.'s and N.D.'s circumstances would have felt insulted or provoked.

¶ 80 The evidence here meets that standard. The setting of the batteries alleged in counts IX, LXXII, LXXIII, and LXXVI was a juvenile detention center where the youths were grouped by gang affiliation. All the alleged batteries occurred in a cottage that housed the most aggressive youths. The battery referenced in count IX occurred in a dayroom and an adjacent hallway. E.E. was punched by X.C. and D.M., each larger than E.E. At times, X.C. and D.M. attacked E.E. simultaneously, punching him numerous times in quick succession. After being punched in the

chest area, E.E. used his arms to protect himself. E.E. retreated from X.C. and D.M. more than once, but the punching continued.

¶ 81    Counts LXXII, LXXIII, and LXXVI alleged the battery of N.D. This alleged battery occurred in N.D.'s room, a much more confined space than the dayroom. N.D. was battered by three youths—D.R., D.M., X.C.—each larger than him. D.R. pushed N.D. against a shelf and then brought him to the ground before D.M. and X.C. entered the room and punched N.D. as he was lying on the ground. Once all three youths were in N.D.'s room, defendant stood blocking the door, preventing N.D. from leaving. A.B., who heard what was happening in N.D.'s room, testified that D.R., D.M., and X.C. encouraged each other to attack N.D., who cried out during the attack. When the encounter ended, D.R., D.M., X.C., and defendant were laughing. N.D. sustained bruising to his body from the attack.

¶ 82    The above evidence, which we must view in the light most favorable to the State, establishes that a reasonable person in E.E.'s and N.D.'s positions would have been, at a minimum, insulted or provoked. Indeed, the evidence, including defendant's own testimony, indicated that E.E. and N.D. were in fact provoked, as they fought with their attackers or attempted to do so. See *People v. Davidson*, 2021 IL App (5th) 190217-U, ¶ 16 (appellate court in *Davidson* commented that, "[i]n this context, it would be reasonable for the jury to infer that defendant's act of defiance was 'insulting' to the officer and his authority. It would be equally reasonable for the jury to infer that defendant's escalation to physical contact would be considered 'provoking' the officer into a physical altercation").

¶ 83    Defendant argues that E.E.'s and N.D.'s laughs and smiles show they were not insulted or provoked. We disagree. Not only did the evidence reveal that the attacks were unwelcome and not necessarily done for sport, but the jury could also reasonably infer that E.E. and N.D. appeared

jovial to avoid (1) showing weakness and protect their egos or (2) inviting further attacks or retaliation in that volatile environment. See *Davidson*, 2023 IL 127538, ¶ 18. Supporting this inference is that A.B. reported the shower attack only after Slott inquired what was wrong with him. The fact that the attack led to A.B.'s transfer permits the reasonable inference that the victims of the attacks in the IYC might have believed they had to laugh off their attacks to avoid transfer to another, potentially worse, facility.

¶ 84 Defendant also implies that the contact with E.E. was not insulting or provoking because the youths who witnessed the attacks seemed unfazed. We disagree for two reasons. First, the jury could reasonably infer that the youths who witnessed the attacks did not react because they, like E.E. and N.D., needed to protect themselves. See *id.* Indeed, defendant's own testimony suggested that, even when the youths were apparently fighting for sport, he might jeopardize his own safety by intervening. If defendant, as a JJS, was reluctant to intervene, the jury could certainly infer that the youths who witnessed the attacks would also be unwilling to do anything. Second, the jury could reasonably accept defendant's testimony that roughhousing was "[v]ery common" at the IYC and conclude that the youths who witnessed E.E. being attacked were so numb to such fighting that they did nothing.

¶ 85                    2. Threat to Youth's Safety

¶ 86 Count LXXIV charged defendant with official misconduct for failing to report a threat to N.D.'s safety. Defendant argues that we must reverse his conviction under count LXXIV because the evidence did not establish beyond a reasonable doubt that the fighting threatened N.D.'s safety.

¶ 87 Black's Law Dictionary defines "threat" as a "communicated intent to inflict harm or loss on another or on another's property, esp. one that might diminish a person's freedom to act voluntarily or with lawful consent; a declaration, express or implied, of an intent to inflict loss or

pain on another \*\*\*." *Threat*, Black's Law Dictionary (11th ed. 2019); see also *Threat*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/threat (last visited Aug. 4, 2023) [https://perma.cc/D242-WKEQ] (defining threat as "an expression of intention to inflict evil, injury, or damage").

¶ 88    Viewing the evidence in the light most favorable to the State, we conclude that the evidence established beyond a reasonable doubt that there was a threat to N.D.'s safety. The evidence revealed an ongoing "fight club" at the IYC. According to R.S., defendant was one of the people in authority who allowed the youths to fight each other. Defendant permitted D.M., D.R., and X.C. to fight smaller youths, including N.D.

¶ 89    When N.D. was attacked on January 13, 2016, D.R. and D.M. were standing in the hallway in front of the door to N.D.'s room. D.R. stood immediately next to the window in the door while N.D. stood on the other side. As defendant opened the door, N.D. attempted to keep it closed. After defendant opened the door, N.D. backed away from the door while D.R. appeared to be preparing to enter the room and fight. At the same time, D.M. motioned for the fight to begin and called to X.C., who jogged down the hallway and appeared to want to join in. The jury could reasonably infer from this evidence that N.D. knew that D.R. and D.M. were standing at his door with defendant because the youths intended to fight him. Moreover, the jury could certainly infer that N.D. attempted to prevent the youths from entering his room, but to no avail. These facts suggest (1) that there was an intention to injure N.D.—he indeed was injured during the subsequent fight—*and* (2) that, by forcing the door open, defendant left N.D. unprotected from the youths who wished to fight him. Thus, the threat to N.D.'s safety was readily apparent.

¶ 90                    C. "Law" Violated in Counts XLVI and LXXIV

¶ 91    As noted above, defendant argues that we must reverse his two convictions of official misconduct under counts XLVI and LXXIV because the charges were based on defendant's violation of internal rules or policies, not laws. In resolving this issue, we begin by examining section 33-3(a)(1) and (a)(2) of the Criminal Code, under which defendant was charged in counts XLVI and LXXIV. That section provides:

> "(a) A public officer or employee or special government agent commits misconduct when, in his official capacity or capacity as a special government agent, he or she commits any of the following acts:
>
> > (1) Intentionally or recklessly fails to perform any mandatory duty as required by *law*; or
> >
> > (2) Knowingly performs an act which he knows he is forbidden by *law* to perform[.]" (Emphases added.) 720 ILCS 5/33-3(a)(1), (2) (West 2016).[3]

¶ 92    The term contested here is "law." "[C]onstruction of the term 'law' presents an issue of statutory interpretation subject to *de novo* review." *Williams*, 239 Ill. 2d at 127. Courts that have examined what "law" means in the official misconduct statute have defined it as " 'an identifiable statute, rule, regulation, or tenet of a professional code.' " *Id.* at 128 (quoting *People v. Grever*, 222 Ill. 2d 321, 337 (2006)). This list of what constitutes "law" is by no means exhaustive. *Id.* "Thus, a provision may be a 'law' within the meaning of the official misconduct statute even if it does not fit squarely within one of [these] categories ***." *Id.* However, there can be no "law" without "formal enactment or informal approval by a governing body." *Id.* at 132.

---

[3] Count XLVI was brought under section 33-3(a)(2), and count LXXIV was brought under section 33-3(a)(1) of the Criminal Code.

¶ 93    With these principles in mind, we examine whether the official misconduct charges in counts XLVI and LXXIV were based on defendant's violation of a "law." Defendant claims that those charges are based on his violations of the PD (cited in count XLVI) and an ID (cited in count LXXIV). He claims that neither of these is a "law" because they were put into place by only one or two individuals. He contends that a "law" is a rule or regulation passed by a governing body, such as a legislature. See *id.* We determine that defendant has misidentified what "law" he was charged with violating in these official misconduct counts.

¶ 94    Counts XLVI and LXXIV alleged that defendant committed official misconduct based on violations of section 2220.40(c) of Title 20 of the Administrative Code (20 Ill. Adm. Code 2220.40(c) (2006)), which provides that "[e]mployees shall comply with departmental rules, written procedures, bulletins and written or verbal orders issued by Department authorities." The counts alleged that defendant violated section 2220.40(c) of Title 20 when he "knowingly performed an act which he knew to be forbidden by law to perform" (count XLVI) or "intentionally failed to perform a mandatory duty as required by law" (count LXXIV). Those counts then specified (1) what defendant did that he was "forbidden by law" to do, namely, "allow[ ] more than two offenders access to the shower at a time," in violation of the PD (count XLVI), and (2) what defendant did *not* do that he was "required by law" *to* do, namely, "report to his supervisor a threat to the safety of [N.D.]," in violation of an ID (count LXXIV). Thus, the bases for the charges are violations of the Administrative Code, not the PD or an ID.

¶ 95    *Samel* is again instructive. There, as noted, the defendant was charged with, for example, "knowingly perform[ing] an act which he knew to be forbidden by law to perform, that law being the LEADS *** Regulations and Policies, *** to wit: the procuring of information,

that being the name and address of a specified vehicle registration number owner from LEADS for purposes other than that of law enforcement." *Samel*, 115 Ill. App. 3d at 908. In ascertaining what "law" the defendant was charged with violating under the official misconduct statute, the appellate court first addressed the defendant's argument that, "since the rules and regulations of an administrative agency do not constitute statutory law, the counts in this matter were fatally flawed and properly dismissed." *Id.* at 910. The court rejected this argument, concluding that "a violation of a rule or regulation properly promulgated by an administrative body may form the basis for prosecution [under the official misconduct statute]." *Id.* at 911. The court noted that the defendant did not argue that the LEADS regulations referenced in the official misconduct charges were improperly promulgated. *Id.* at 910. The court clarified that the defendant "was not charged with the *criminal offense* of violating any LEADS regulation." (Emphasis added.) *Id.* at 912. Rather, "[a LEADS] regulation [was] only relevant in that it establish[ed] the lawful obligation which the defendant [was] compelled to obey [citation]." *Id.*

¶ 96 Here, it is even clearer that the official misconduct charges were based on violations of "law." The PD and the ID might be the ultimate sources of the duties counts XLVI and LXXIV allege were breached, but those official misconduct charges are based directly on section 2220.40(c) of Title 20 of the Administrative Code (20 Ill. Adm. Code 2220.40(c) (2006))—not the PD or the ID. Defendant does not argue that this section of the Administrative Code was improperly promulgated. Like the LEADS regulations in *Samel*, the PD and the ID merely established "the lawful obligation which the defendant [was] compelled to obey [citation]." *Samel*, 115 Ill. App. 3d at 912. That is, like the LEADS regulations in *Samel*, the PD and the ID were not the "law" that defendant violated for purposes of the official misconduct charges in counts XLVI and LXXIV.

¶ 97 The fact that the official misconduct charges were based on violations of the Administrative Code makes this case different from both *Williams* and *People v. Dorrough*, 407 Ill. App. 3d 252 (2011), on which defendant relies. In *Williams*, the defendant was charged with official misconduct in that she violated rules and regulations of the Glenwood Police Department. *Williams*, 239 Ill. 2d at 121, 124. Because no evidence was presented indicating that these rules and regulations were properly promulgated, our supreme court determined that a violation of these rules and regulations was not a violation of "law" under the official misconduct statute. *Id.* at 133. Similarly, in *Dorrough*, the defendant was charged with official misconduct for violating the regulations of the Harvey Police Department. *Dorrough*, 407 Ill. App. 3d at 253. Lacking any evidence that the police regulations were properly promulgated, the appellate court determined that they were not "law" within the meaning of the official misconduct statute. *Id.* at 255.

¶ 98                                  III. CONCLUSION

¶ 99 For the foregoing reasons, we affirm the judgment of the circuit court of Kane County.

¶ 100 Affirmed.

*People v. Klimek*, **2023 IL App (2d) 220372**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 16-CF-2020; the Hon. David P. Kliment, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Jessica Wynne Arizo, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Max C. Boose, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |