2024 IL App (4th) 230486

NO. 4-23-0486

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 7, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Tazewell County |
| JEFFREY L. REINKING, | ) | No. 19CF145 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Christopher R. Doscotch, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court, with opinion.
Justices Doherty and Lannerd concurred in the judgment and opinion.

**OPINION**

¶ 1        Following a bench trial, defendant, Jeffrey L. Reinking, was found guilty of unlawful delivery of a firearm and sentenced to 18 months in prison. Defendant appeals, arguing the trial court erred by (1) denying his pretrial motion to dismiss the indictment, (2) denying his motion for a directed finding at the close of the State's case, (3) finding him guilty at the close of trial, and (4) rejecting his posttrial claim of ineffective assistance of counsel. For the reasons that follow, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3                                    A. Indictment

¶ 4        In April 2019, a grand jury returned a bill of indictment charging defendant with unlawful delivery of a firearm as set forth in section 24-3(A)(e) of the Criminal Code of 2012

(Criminal Code) (720 ILCS 5/24-3(A)(e) (West 2016)). Specifically, the indictment alleged defendant had committed the charged offense in that he, sometime between November 12 and 30, 2017, "knowingly gave a firearm, a Bushmaster AR-15, to Travis Reinking, who had been a patient at Methodist Medical Center of Illinois Mental Health Unit within the past five years." Defendant retained counsel to represent him against the charge.

¶ 5                    B. Motion to Dismiss the Indictment

¶ 6          In June 2019, defendant filed a motion to dismiss the indictment, arguing it (1) failed to state an offense and (2) was based upon a statute, section 24-3(A)(e) of the Criminal Code (*id.*), that is unconstitutionally vague on its face and as applied to him. In pertinent part, defendant, as for his first argument, asserted the indictment failed to set forth the nature of the offense charged by not specifying the alleged unlawful "giving" conduct. As for his second argument, defendant asserted the statutory language prohibiting the selling or giving of a firearm did not provide sufficient notice that it would include, as applicable in this case, the return of Travis's own firearm to him. Following a June 2020 hearing, the trial court, the Honorable Katherine S. Gorman presiding, entered a written order denying defendant's motion.

¶ 7                             C. New Counsel

¶ 8          In August 2020, defendant's counsel moved to withdraw from the case due to irreconcilable differences with defendant, which the trial court allowed. Defendant retained new counsel, Attorney Kevin Sullivan (Attorney Sullivan), to represent him against the charge. Attorney Sullivan entered a formal appearance as defense counsel on September 1, 2020.

¶ 9                             D. Bench Trial

¶ 10         On May 13, 2022, the trial court, the Honorable Christopher R. Doscotch presiding, conducted a bench trial.

¶ 11                                    1. *Inquiry of Defendant*

¶ 12          At the commencement of the proceeding, the trial court addressed defendant in open court. The court admonished defendant of the charge in the indictment, which defendant indicated he "heard." The court asked defendant if he was in good physical and mental condition for the proceeding, to which defendant responded, "Yeah." The court asked defendant if he understood the purpose of the proceeding, to which defendant responded, "Yes." The court asked defendant if he was under the influence of any alcohol or drugs that would affect his ability to participate in the proceeding, to which defendant responded, "No." The court asked defendant if he discussed the case with his counsel, to which defendant responded, "Yes." After Attorney Sullivan informed the court defendant had declined prior plea offers, defendant, on examination of the court, confirmed his counsel's statement was correct. The court admonished defendant, should he leave or not appear at any later sentencing hearing, the matter may proceed in absentia, to which defendant indicated he understood. And last, the court admonished defendant of his right to testify, to which defendant indicated he understood.

¶ 13                                    2. *Stipulations*

¶ 14          The State, following the inquiry of defendant, represented to the trial court that the parties had agreed to several stipulations. Attorney Sullivan, on examination by the court, agreed with the State's representation. Attorney Sullivan also indicated he had reviewed the stipulations "[a]s recently as yesterday" with defendant. The court paused to read the stipulations. The stipulations, which are set forth in a document signed by both the State and Attorney Sullivan, are as follows:

          "1. Unity[P]oint Methodist Hospital Peoria is a medical
          facility that receives patients for all types of medical care including

- 3 -

mental health care. Within Unity[P]oint Methodist Medical Center Hospital Peoria, there is a department called the Behavioral Health Unit, where persons with mental illness are evaluated and provided mental health care and mental health treatment. The Behavioral Health Unit of Unity[P]oint Methodist Peoria is and was and has been at all times relevant and material, a 'mental institution' as defined in 720 ILCS 5/24-3(A)(e). Unity[P]oint Methodist Medical Center Hospital Peoria is and was and has been at all times material and relevant, a hospital, institution, clinic, or evaluation facility, mental health center or part thereof which is used primarily for the care or treatment of persons with mental illness.

2. Late on the night of May 26, 2016, Travis Reinking was transported by an Emergency Response Service employee from the area of 1005 W. Jackson Street in Morton, proximate to a CVS Pharmacy parking lot, to Unity[P]oint Methodist Medical Center Hospital Peoria.

3. Travis Reinking was involuntarily admitted to the Behavioral Health Unit at Unity[P]oint Methodist Medical Center Peoria on May 27, 2016[,] and remained admitted to the Behavioral Health Unit at Unity[P]oint Methodist Medical Center in Peoria until being released on June 3, 2016. Defendant Jeffrey Reinking, at all times since May 27, 2016, knew that Travis Reinking was admitted to the Behavioral Health Unit at Unity[P]oint Methodist

Medical Center in Peoria on May 27, 2016[,] and knew that Travis Reinking remained admitted to the Behavioral Health Unit at Unity[P]oint Methodist Medical Center in Peoria until June 3, 2016.

4. While admitted at Unity[P]oint Methodist Medical Center Hospital Peoria from May 27, 2016[,] to June 3, 2016, Travis Reinking received mental health treatment. During those dates from May 27, 2016[,] to June 3, 2016, Travis Reinking was a 'patient in mental institution' as that term is defined in 720 ILCS 5/24-3(A)(e).

5. Defendant Jeffrey Reinking had in his possession a Bushmaster AR-15 firearm owned by Travis Reinking. Defendant, between November 12 and November 30, 2017, at Morton, Illinois in the County of Tazewell, knowingly gave the Bushmaster AR-15 firearm to Travis Reinking at a time less than five (5) years from the date of Travis'[s] admission to the Behavioral Health Unit at Unity[P]oint Methodist Medical Center in Peoria."

¶ 15                    3. *Opening Statements*

¶ 16        In opening statements, the State, after addressing the elements it was required to prove to establish defendant's guilt of the charged offense, asserted that most of the elements were proven by the stipulations "signed by both parties and presented to the [trial] [c]ourt." The State then reviewed those facts, which the stipulations established. For instance, the State stated the stipulations "establish that the defendant Jeffrey Reinking knowingly gave Travis Reinking that firearm at a time less than five years from the time that Travis Reinking was admitted to the UnityPoint Methodist Medical Center behavioral-health unit." The State contended the only issue

not directly addressed by the stipulations was whether defendant knew Travis was a "patient in a mental institution" as it had been statutorily defined. Specifically, the State contended the issue, applying the statutory definition, was whether defendant knew Travis's admission at UnityPoint was "for mental[ ]health treatment."

¶ 17 In response, Attorney Sullivan agreed with the State's representation of the primary issue before the trial court—whether defendant knew Travis's admission at UnityPoint was for "mental[ ]health treatment." Attorney Sullivan also asserted another issue related to whether defendant could "give" Travis a firearm that Travis already owned. Attorney Sullivan asserted the terms "give" and "gave"—as set forth in the "statute" and "indictment"—did not, as a "matter of law," include returning something to somebody who already owns it. As for the secondary issue, Attorney Sullivan, on inquiry of the court, indicated the issue stemmed from the pretrial motion to dismiss the indictment and asserted he was raising the issue to "preserve" it for appeal.

¶ 18                                              4. *State's Case*

¶ 19 The State first presented testimony from Ricardo Mancha, an Illinois state police trooper. Trooper Mancha testified about an incident on May 26, 2016, when he was a patrol deputy with the Tazewell County Sheriff's Office. Around 10 p.m. that day, Trooper Mancha was patrolling in Morton when he observed Rob Mooney from Emergency Response Services (ERS) in a CVS parking lot. Trooper Mancha testified ERS did "mental[ ]health evaluations."

¶ 20 Trooper Mancha approached Mooney in the CVS parking lot to see if he needed assistance. Mooney requested Trooper Mancha to stay as he was speaking with an individual who was possibly having paranoid delusions and a mental health crisis. Trooper Mancha identified the individual with whom Mooney was referring as Travis Reinking. Trooper Mancha also identified other individuals present in the parking lot as Travis's father, defendant, as well as Travis's mother

and grandmother. Trooper Mancha observed Mooney speaking with Travis "[a]nd his family" when Trooper Mancha initially arrived at the scene.

¶ 21        Trooper Mancha stood next to Mooney while Mooney spoke with Travis. Trooper Mancha estimated Travis's family, including defendant, were about one car length away from them. Trooper Mancha testified Travis was "irate, speaking loudly about the delusions he was having," specifically "explaining how the entertainer Taylor Swift was stalking him and hacking his electronic devices." Travis, in so explaining, acknowledged "it sounded crazy" but maintained it was true. Trooper Mancha believed Travis needed mental health assistance based upon his statements and suggested the same to "[e]veryone who was there at the time." Travis refused the suggested mental health assistance, got into his vehicle, and drove away.

¶ 22        After Travis left the CVS parking lot, Trooper Mancha learned from Travis's "family" and Mooney that Travis had made suicidal statements prior to Trooper Mancha's arrival. Trooper Mancha also learned Travis had access to firearms at his residence in Tremont. This new information caused Trooper Mancha further concern about Travis's mental state, as well as the safety of Travis and others. As a result, Trooper Mancha contacted the Tremont Police Department and requested an officer go to Travis's residence.

¶ 23        Shortly thereafter, Travis returned to the CVS parking lot in his vehicle, where Trooper Mancha and the others were still present. Travis exited his vehicle and approached them. Trooper Mancha described Travis as still being "irate, speaking loudly about the delusions he was having." Trooper Mancha testified Travis specifically conveyed the following:

> "[H]e had agreed to meet Taylor Swift at the Dairy Queen in Morton
> and he went to the Dairy Queen to meet her. Once he got to the—
> arrived at the Dairy Queen, she was across the street. When he saw

her, they made eye contact. She took off running down the street. He followed her. He chased her. She was running. She had—he stated she scaled the side of a building and got on the roof, so he did the same, followed her up there. And when he had gotten to the roof, she was gone."

Trooper Mancha testified Travis's family, including defendant, was approximately one car length away from Travis when he was making these statements.

¶ 24 Trooper Mancha testified Travis attempted to leave the CVS parking lot a second time. At that point, Trooper Mancha and another patrol officer who had arrived at the scene, Jason Cabell, stood between Travis and his vehicle, and Travis stopped. Trooper Mancha testified they explained to Travis that it was in his best interest to seek mental health assistance because he was experiencing a mental health crisis. They also offered to drive Travis to get the recommended assistance. Eventually, Travis agreed to seek mental health assistance and leave with Mooney. Mooney and Travis left in Mooney's vehicle, and Officer Cabell followed behind in a marked patrol vehicle.

¶ 25 Trooper Mancha testified he spoke with Travis's family members, including defendant, after Travis left with Mooney. Trooper Mancha indicated Travis's family members were directly in front of him while he was speaking with them, and he believed he had their attention while he was speaking. When asked what he told Travis's family members, Trooper Mancha testified, "I just clarified where he was going. He was going to OSF—er, not OSF, UnityPoint Methodist, because they have a mental[ ]health facility there, with Rob Mooney, and just clarified that Officer Cabell was just following for their own safety." Trooper Mancha testified he also advised Travis's family not to entertain Travis's delusions. Trooper Mancha and Travis's

family discussed what to do with Travis's vehicle, and the family agreed defendant would drive Travis's vehicle away from the scene.

¶ 26        On cross-examination, Trooper Mancha agreed he did not know specifically what the family heard or understood and it was possible they could not have heard him. Trooper Mancha also agreed, although he had training to identify a "psychological episode," he was not qualified to diagnose a psychiatric condition.

¶ 27        The State next presented testimony from Jason Cabell, an investigator with the Morton Police Department. Investigator Cabell testified about an incident on May 26, 2016, when he was a patrol officer with the Morton Police Department. That evening, he went to the CVS in Morton. Upon his arrival, Trooper Mancha, Mooney from ERS, Travis, Travis's mother, Travis's grandmother, and defendant were present. Investigator Cabell noticed Travis was "clearly frustrated, agitated, upset." Investigator Cabell testified Travis made statements indicating Taylor Swift was talking to him through his electronic devices, including his cell phone, Netflix account, and television. Travis also talked about following Taylor Swift to the Dairy Queen in Morton and trying to find her on top of a building. Investigator Cabell testified Travis was not talking quietly and, at times, was yelling. Investigator Cabell also testified defendant was a few feet away from Travis when Travis was making these statements. Investigator Cabell and others "tried to talk [Travis] into going to get treatment." Travis eventually agreed "but he made a statement that it was against his will." Mooney drove Travis to UnityPoint Methodist hospital, while Investigator Cabell followed behind in a marked police vehicle.

¶ 28                    5. *Motion for a Directed Finding*

¶ 29        At the close of the State's case, defendant moved for a directed finding, arguing the State failed to present any evidence showing he knew Travis's admission at UnityPoint was for

mental health treatment. The trial court denied defendant's motion. Attorney Sullivan then requested a recess to speak with defendant about testifying, which the court allowed.

¶ 30                                6. *Defendant's Case*

¶ 31        Attorney Sullivan, following the recess, presented testimony from defendant. Defendant testified to being born with hearing loss, wearing hearing aids, and having difficulty hearing. Defendant was then examined about the circumstances related to the charge in this case.

¶ 32        Defendant testified, on May 26, 2016, there was an incident at the CVS in Morton. Defendant drove to the CVS and, upon his arrival, his son, Travis, as well as his wife and mother were present. Officers were just arriving. Defendant testified he could not hear the conversation Travis was having with the "first responders." Defendant testified he was present when Travis left in a vehicle. When asked if he was aware Travis was taken to a hospital, defendant testified he learned that fact later on, but he did not know why Travis was taken there and alluded to an "evaluation because he had gotten hurt on a job."

¶ 33        Defendant testified he later learned Travis was in the behavioral health unit at UnityPoint. He asserted he was not notified of, or involved in, a mental-health court proceeding in Peoria on May 27, 2016. Defendant visited Travis "a couple times" while Travis was at UnityPoint. Defendant explained he and his wife "just sat at a table and talked to [Travis]." Defendant did not see anyone provide treatment, medication, or counseling to Travis. Defendant asserted he was not told why Travis was there, he did not ask anyone why Travis was there, and Travis did not tell him why he was there. Defendant testified he was never made aware Travis was sent to the behavioral health unit for mental health treatment.

¶ 34        After Travis was discharged from UnityPoint, defendant picked him up. Defendant testified Travis never told him what transpired when he was in the hospital, and defendant never

asked. Defendant asserted Travis seemed "grounded" and "normal" upon his discharge; there was no "Taylor Swift talk."

¶ 35     In middle to late 2017, defendant took possession of Travis's firearms, which were purchased and owned by Travis. Defendant did so because Travis's Firearm Owner's Identification (FOID) card was revoked for a residency issue. Attorney Sullivan asked, "In one of our stipulations, number 5 to be exact, it said that you had a Bushmaster AR-15 firearm in your possession; is that correct?" Defendant responded, "That's what they say. I didn't know what the firearms were at that time."

¶ 36     Defendant testified Travis later demanded the return of his firearms and threatened to sue him for withholding them from him. Defendant "checked the website, the FOID Act, on residency" and contacted the Tazewell County Sheriff's Office for advice. Defendant believed Travis "could have [the firearms] and pass through the state."

¶ 37     Defendant returned the firearms to Travis. He did so when Travis had his vehicle loaded with other items and was leaving Illinois. Defendant did not believe Travis would harm himself or anybody else when he returned the firearms to him.

¶ 38     On cross-examination, defendant was asked, "You went to [the CVS] because you knew [Travis] was having some mental[ ]health difficulties, correct?" Defendant responded:

> "Well, he was complaining about his phone and laptop, and I didn't
>
> know how to check that out. I told him he needed to go to the police,
>
> and he said the police wouldn't look at it. So that's why he got this
>
> ERS number, and I didn't know what that was."

Defendant was asked about the complaints Travis had about his phone and laptop, to which he replied, "He was hacked. Somebody was hacking it. Like, I don't know, it could have been Taylor

Swift, like he talked about, doing something on his phone and his laptop." When asked if defendant believed Taylor Swift had done something to his son's phone and laptop, defendant replied, "I don't know. I don't know." When asked if defendant believed Taylor Swift could have done something to his son's phone and laptop, defendant replied, "Well, I don't know if it's her or somebody else. Somebody—the way Travis was acting, somebody was doing something."

¶ 39 Defendant testified he called ERS and "talked to Rob." When asked if he understood ERS to be a service for persons with mental health issues, defendant replied, "No." When asked why he did not call the police, defendant replied, "Because I thought it was—I thought this guy was like a counselor that would help him sort out what was going on with his devices." As to his understanding of the function of ERS, defendant explained, "I thought it was just counselors. A guy would come out and help him assess what's going on." Defendant testified he called the ERS number for assistance without knowing what the number was for "[b]ecause I didn't know what else to do."

¶ 40 Defendant testified he hoped Travis was going to UnityPoint to be evaluated for a work-related injury. Defendant testified he did not talk to anyone other than family members at the CVS because, "if I'm standing a car length away, I could not hear them." The State asked, "How far apart do you believe we are right now?" Defendant replied, "Yeah, but we're—it's quiet and we're talking. I don't know if—you know, hearing aids pick up everything. If cars are driving by, it picks that up."

¶ 41 The State asked, "Would it be fair to say that when you were there in the CVS parking lot that night you were concerned about your son Travis Reinking?" Defendant replied, "Yeah. I wanted to help him, see what was going on with his phone and his laptop." Defendant testified he did not speak to Travis while in the CVS parking lot and in front of the police officers

because Travis had accused him of possessing drugs. The State asked defendant if he thought it was odd that Travis would accuse him of possessing drugs, to which defendant replied, "I don't know."

¶ 42 Defendant acknowledged he visited Travis twice at the behavioral health unit. He agreed he had to pass through a locked door to get inside.

¶ 43 The State asked, "[Y]our testimony is you believe on this night of May 26 that there was a threat of some kind to [Travis], correct?" Defendant replied, "For his phone and laptop?" The State asked, "You believe there was a threat to your son, correct?" Defendant replied, "Well, I didn't know what was going on with it." The State asked, "And during all this time, you don't ask any questions about what's going on with your son, correct?" Defendant replied, "Right."

¶ 44                                       7. *Closing Arguments*

¶ 45 In closing arguments, the State argued it had proven defendant's guilt of the charged offense. As it did in its opening statement, the State addressed the stipulations. For instance, the State quoted stipulation 5 and then argued it "clearly establishes that the defendant knowingly gave the firearm to another, that being Travis Reinking."

¶ 46 In response, Attorney Sullivan argued the State had not proven defendant knew Travis's admission at UnityPoint was for mental health treatment. Attorney Sullivan also noted he was "renew[ing]" and "preserving" its position that the return of Travis's own firearm to him was not prohibited.

¶ 47                                       8. *Trial Court's Finding*

¶ 48 After considering the evidence and arguments presented, the trial court found defendant guilty of the charged offense. The court, in reaching its finding, found the testimonies of Trooper Mancha and Investigator Cabell were credible. As for defendant's testimony, the court

found there were "some [credibility] issues." Specifically, the court ruled:

> "As to Mr. Reinking's testimony, the Court does have some issues with the credibility of his testimony. The part about calling ERS about computer laptop hacking is just one of the various issues in that regard. And specifically, in terms of the officer directly addressing Mr. Reinking and Mr. Reinking's denial of the same, the Court will find the officer more credible on that point."

The court noted defendant's argument regarding the interpretation of the statute setting forth the criminal offense had been considered, rejected, and preserved for appeal.

¶ 49                E. Posttrial Motion and New Counsel

¶ 50        In June 2022, defendant, through Attorney Sullivan, filed a timely posttrial motion challenging various rulings of the trial court. Defendant retained new counsel, and Attorney Sullivan was allowed to withdraw from the case. Defendant's new counsel filed an amended posttrial motion contending the court erred by denying his pretrial motion to dismiss the indictment, denying his motion for a directed finding at the close of the State's case, and finding him guilty at the close of trial. Defendant also claimed Attorney Sullivan provided ineffective assistance by agreeing to the stipulations, failing to present certain defenses, and failing to prepare him to testify.

¶ 51                F. Hearing on the Posttrial Motion

¶ 52        In December 2022, the trial court conducted a hearing on defendant's posttrial motion. Defendant presented the court with several exhibits as well as testimony from Attorney Sullivan, James Muncy, and Judy Reinking. Defendant also testified.

¶ 53                                    1. *Attorney Sullivan*

¶ 54          Attorney Sullivan testified he had been an attorney for 35 years and had handled a "multitude of different types of cases" across Illinois. He primarily practiced criminal law. Over the years, he had handled in excess of 100 trials.

¶ 55          Around September 2020, Attorney Sullivan was retained to represent defendant against the charge in this case. Thereafter, Attorney Sullivan met with defendant at court appearances, at his office, and, on at least one occasion, at defendant's house. Attorney Sullivan estimated he met with defendant approximately 10 times. The meetings were typically an hour in length, with some lasting several hours and some occurring on weekends. Defendant would often bring his wife or a friend with him to the meetings. Attorney Sullivan recalled at least one meeting where defendant was alone. Attorney Sullivan estimated he had spent 100 hours representing defendant in this matter.

¶ 56          As for the stipulations, Attorney Sullivan testified, on January 6, 2022, he e-mailed draft stipulations to defendant. On January 11, 2022, defendant responded he was not agreeing to the stipulations so they could talk again. Attorney Sullivan's responded to defendant's e-mail with, "Really?" On January 13, defendant forwarded an e-mail to Attorney Sullivan from defendant's friend, Jim Muncy, concerning suggested changes to the stipulations. On January 15, 2022, defendant texted Attorney Sullivan to ask if he could make the changes suggested by Muncy, to which Attorney Sullivan told defendant he had already done so.

¶ 57          Attorney Sullivan believed there were two or three drafts of the stipulations. The final draft was prepared by the State and sent to him. Attorney Sullivan did not recall if he e-mailed or texted the revised stipulations to defendant following the exchange about them in January 2022 but asserted that, over the months that followed, he and defendant met and discussed them. When

asked if he went over the stipulations with defendant sometime between mid-January and the first part of May 2022, Attorney Sullivan testified, "Yes." When asked if he knew the date he went over the stipulations with defendant, Attorney Sullivan testified, "One of the days was the day before the trial when he was in the office. Before that, I think we got in in March of 2022. March 7th maybe, give or take." As for his review of the stipulations with defendant the day before trial, Attorney Sullivan testified, "Oh, I—we went over it, I maybe didn't show it to him ***. We discussed them, each one of them, the substance of each one."

¶ 58　　　　Attorney Sullivan believed the stipulations tendered at defendant's trial were acceptable to defendant. Attorney Sullivan testified he did not know if defendant saw the final draft of the stipulations but knew they had "discussed them as recently as the day before trial." Attorney Sullivan testified defendant never objected to the stipulations or expressed concerns about them on the day of the trial.

¶ 59　　　　As for the substance of the stipulations, Attorney Sullivan testified he stipulated to facts he believed "were very easy to prove by the State." As for the stipulation to the fact Travis was a patient in a mental institution, Attorney Sullivan testified, "[I]t was a very easily proved fact and I didn't want a witness coming and testifying live to that." As for the stipulation to the fact defendant "gave" the firearm to Travis, Attorney Sullivan acknowledged "perhaps in second thought I shouldn't have used the term 'gave,' but I did everything to certainly preserve that issue and make it understood exactly what happened in that situation."

¶ 60　　　　Attorney Sullivan testified about the defense theories he chose to pursue at defendant's trial. Attorney Sullivan testified "the best one" he found was defendant was not aware Travis had received mental health treatment while at UnityPoint. Attorney Sullivan indicated he also adopted the pretrial motion to dismiss the indictment.

¶ 61　　　　　Attorney Sullivan was asked about other theories of defense, all of which he indicated he considered and chose not to pursue. As for a defense based upon the fact the Illinois State Police was not notified of Travis's involuntary commitment, which would have warranted Travis's FOID card being revoked on that ground, Attorney Sullivan testified he did not think that would be the "strongest defense" and, in fact, was not sure if it even qualified as a defense. As for a defense based upon defendant having contacted the Tazewell County Sherrif's Department about returning Travis's firearms to him, Attorney Sullivan testified he reviewed recordings of discussions defendant had with sheriff's deputies and the discussions concerned residency issues, not mental health issues. Attorney Sullivan believed that fact "mitigated the possibility of effectively asserting" any such defense.

¶ 62　　　　　Attorney Sullivan was examined about preparing defendant to testify at trial. Attorney Sullivan explained he told defendant that he hoped defendant would not have to testify but there was a "possibility" as often times "those decisions are made during the middle of a trial." When asked why he did not "prepare" defendant to testify if he believed there was a possibility of defendant having to do so, Attorney Sullivan testified:

> "Because every time we had talked about this case from the first day
> that I assumed his representation, he told a consistent story. We
> talked about exactly what the defense was, and we talked about why
> I wanted him to testify that day, and I thought he could certainly
> repeat the story that we've talked about ad nauseam a number of
> times."

¶ 63　　　　　　　　　　　　2. *James Muncy*

¶ 64　　　　　James Muncy testified he was a business marketing professor who had been

- 17 -

defendant's friend for approximately two years. In January 2022, Muncy reviewed and suggested changes to draft stipulations in this case. Muncy attended approximately three meetings between defendant and Attorney Sullivan, which lasted "[a]bout an hour." When asked if the stipulations were discussed during the meetings he attended, Muncy replied, "It could have been discussed in the abstract, but no specifics." Muncy asserted he did not see the written stipulations again until after defendant's trial. Muncy asserted he would not have agreed to the stipulations had he seen them prior to the trial. Muncy acknowledged being present at the trial. Muncy also acknowledged he was unhappy with the finding of guilt and did not want to see his friend be punished.

¶ 65                                    3. *Judy Reinking*

¶ 66            Judy Reinking, defendant's wife, testified she and defendant met with Attorney Sullivan on May 12, 2022, for "a couple [of] hours." As for the substance of that meeting, Judy testified there "wasn't a lot of details, you know, and we did some small talk" about "family and things like that, you know." Judy testified Attorney Sullivan "[a]bsolutely" did not address the stipulations during the meeting and also had not done so at any other meeting she attended. Judy asserted, had she seen the stipulations, she would have raised concerns about them. Judy acknowledged being present at defendant's trial. Judy also acknowledged she was unhappy with the finding of guilt and did not want to see her husband be punished.

¶ 67                                    4. *Defendant*

¶ 68            Defendant testified he has a hearing disability, has difficulty hearing, and wears hearing aids. Defendant testified it is difficult for him to hear when people face away from him.

¶ 69            Defendant acknowledged attending several meetings with Attorney Sullivan, some of which lasted several hours. Defendant also acknowledged attending several court appearances with Attorney Sullivan. Defendant testified his wife or Muncy were always with him at the

- 18 -

meetings.

¶ 70    As for the stipulations, defendant testified, in January 2022, he objected to the stipulations after receiving them. Thereafter, he never received revised written stipulations. As for his meeting with Attorney Sullivan on May 12, 2022, defendant testified Attorney Sullivan "probably told me what to maybe expect in here, you know, the atmosphere, and whatever is going on." Defendant testified he was not shown the revised stipulations during that meeting and, had he been shown, he would not have agreed to them. Defendant acknowledged he did not object to the stipulations or communicate concerns about them to Attorney Sullivan or the trial court at his trial. Defendant asserted he might have spoken up or said something to Attorney Sullivan had he heard the stipulations. Defendant also asserted he did not know he could object to the stipulations.

¶ 71    As for testifying, defendant asserted he was not prepared to do so by Attorney Sullivan.

¶ 72    Defendant acknowledged he was unhappy with the finding of guilt and did not want to be punished.

¶ 73                    5. *Trial Court's Ruling*

¶ 74    After receiving both oral and written arguments and taking the matter under advisement, the trial court entered a three-page, single-spaced order denying defendant's posttrial motion. The court stood on the previous rulings denying the pretrial motion to dismiss the indictment, denying the motion for a directed finding at the close of the State's case, and finding defendant guilty at the close of trial. As for defendant's posttrial claim of ineffective assistance of counsel, the court rejected it. In doing so, the court indicated it considered all of the evidence before it, including the testimony presented at the hearing on the posttrial motion. The court found Attorney Sullivan's testimony to be credible. With respect to the testimony of defendant, Judy

Reinking, and James Muncy, the court indicated it "views and considers their testimony from the lens of persons dissatisfied with the case outcome." In pertinent part, the court found (1) Attorney Sullivan "orally reviewed the stipulations with defendant on several occasions" following the January 2022 emails, (2) defendant "did not object to the final version of the stipulations," and (3) "the stipulations were a matter of trial tactics and strategy." The court concluded Attorney Sullivan's "actions were not deficient and were a product of sound trial strategy." The court further concluded that, even if it was deficient for Attorney Sullivan to stipulate to the fact defendant "gave" the firearm to Travis, defendant's claim still failed as no prejudice resulted from that stipulation.

¶ 75                              G. Sentencing

¶ 76          In March 2023, the trial court held a sentencing hearing. At the hearing, it was stipulated (1) Travis Reinking was convicted of, amongst other crimes, four counts of first degree murder for killing four people at a Waffle House in Nashville, Tennessee, on April 22, 2018, and (2) the "Bushmaster firearm" that defendant "returned to" Travis in November 2017 was used by Travis to commit the 2018 killings. The court, after considering the evidence and recommendations presented, sentenced defendant to 18 months in prison. Defendant filed a timely motion to reconsider his sentence, which the court denied after a May 2023 hearing.

¶ 77          This appeal followed.

¶ 78                              II. ANALYSIS

¶ 79          On appeal, defendant argues the trial court erred by (1) denying his pretrial motion to dismiss the indictment, (2) denying his motion for a directed finding at the close of the State's case, (3) finding him guilty at the close of trial, and (4) rejecting his posttrial claim of ineffective assistance of counsel. The State disagrees with each of defendant's arguments.

¶ 80          A. The Denial of the Pretrial Motion to Dismiss the Indictment

¶ 81          Defendant argues the trial court erred by denying his pretrial motion to dismiss the indictment. Defendant maintains the indictment should have been dismissed because it (1) fails to state the nature of the charge and (2) is based upon a statute, section 24-3(A)(e) of the Criminal Code (720 ILCS 5/24-3(A)(e) (West 2016)), that is unconstitutionally vague on its face and as applied to him.

¶ 82          We begin with defendant's contention that the indictment should have been dismissed because it fails to state the nature of the charge.

¶ 83          "A criminal defendant has a fundamental right to be informed of the nature and cause of criminal accusations made against him." *People v. Carey*, 2018 IL 121371, ¶ 20, 104 N.E.3d 1150; see U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. In Illinois, this right is implemented by section 111-3 of the Code of Criminal Procedure of 1963 (Procedure Code) (725 ILCS 5/111-3 (West 2016)), which sets forth specific pleading requirements for a criminal charge. *Carey*, 2018 IL 121371, ¶ 20. Where, as here, a charging instrument is challenged in a pretrial motion, "the charging instrument must strictly comply with the requirements in section 111-3(a)." *Id.* ¶ 21; see, *e.g.*, *People v. Kidd*, 2022 IL 127904, ¶ 13, 215 N.E.3d 908.

¶ 84          Section 111-3(a)(3) of the Procedure Code (725 ILCS 5/111-3(a)(3) (West 2016)) states any criminal charge must set "forth the nature *** of the offense charged." It is well established that "[t]he language of the statute can serve to apprise the defendant of *** the nature *** of the offense, so long as the statutory language specifies, with reasonable certainty, the type of conduct being alleged." *People v. Wisslead*, 108 Ill. 2d 389, 394, 484 N.E.2d 1081, 1083 (1985). The issue of whether a charging instrument states the nature of the offense charged is a question of law, subject to *de novo* review. See *Kidd*, 2022 IL 127904, ¶ 14.

¶ 85      In this case, defendant was charged with unlawful delivery of a firearm, as set forth in section 24-3(A)(e) of the Criminal Code (720 ILCS 5/24-3(A)(e) (West 2016)). Section 24-3(A)(e) provides:

"(A) A person commits the offense of unlawful sale or delivery of firearms when he or she knowingly does any of the following:

* * *

(e) Sells or gives any firearm to any person who has been a patient in a mental institution within the past 5 years. In this subsection (e):

'Mental institution' means any hospital, institution, clinic, evaluation facility, mental health center, or part thereof, which is used primarily for the care or treatment of persons with mental illness.

'Patient in a mental institution' means the person was admitted, either voluntarily or involuntarily, to a mental institution for mental health treatment, unless the treatment was voluntary and solely for an alcohol abuse disorder and no other secondary substance abuse disorder or mental illness." *Id.*

¶ 86      The indictment in this case alleged defendant had committed the offense of unlawful delivery of a firearm in that he, sometime between November 12 and 30, 2017,

"knowingly gave a firearm, a Bushmaster AR-15, to Travis Reinking, who had been a patient at Methodist Medical Center of Illinois Mental Health Unit within the past five years."

¶ 87       Defendant claims the indictment fails to state the nature of the charge in that it does not specify the alleged unlawful "giving" conduct. We disagree. The indictment undisputedly uses statutory language to describe the prohibited conduct. See *People v. Klimek*, 2023 IL App (2d) 220372, ¶ 56, 228 N.E.3d 387 ("Ordinarily, when the counts of an indictment follow the statutory language in setting out the nature and elements of an offense, the requirements of section 111-3 are met." (Internal quotation marks omitted.)). In fact, the indictment narrows the conduct alleged to have been unlawful by omitting the statutory "selling" language and using only the statutory "giving" language. While it is true, as defendant asserts, the statutory term "give" encompasses several types of giving (*i.e.*, gifting, transferring, or returning), we find the language specifies, with reasonable certainty, the type of unlawful conduct being alleged. See *id.* ("If the statutory language describes specific conduct, there is no need for the charge to specify the exact means by which the conduct was carried out." (Internal quotation marks omitted.)). Indeed, defendant does not identify any analogous case finding similar language of an indictment to be insufficient.

¶ 88       We find the indictment states the nature of the charged offense and the trial court did not err in denying defendant's pretrial motion to dismiss the indictment on this basis.

¶ 89       Next, we consider defendant's contention that the indictment should have been dismissed because it is based upon a statute, section 24-3(A)(e) of the Criminal Code (720 ILCS 5/24-3(A)(e) (West 2016)), that is unconstitutionally vague on its face and as applied to him.

¶ 90       We begin with "the principle that all statutes are presumed to be constitutional." *People v. Waid*, 221 Ill. 2d 464, 480, 851 N.E.2d 1210, 1219 (2006). It is the burden of defendant, as the party challenging the validity of the statute, "to demonstrate clearly a constitutional

violation." *Id.* The issue of whether a statute is constitutional is a question of law, subject to *de novo* review. *People v. McCarty*, 223 Ill. 2d 109, 135, 858 N.E.2d 15, 32 (2006).

¶ 91    A statute will be found to violate constitutional due process protections on the basis of vagueness "only if the terms of the statute are so ill-defined 'that the ultimate decision as to its meaning rests on the opinions and whims of the trier of fact rather than any objective criteria or facts.' " *People v. Molnar*, 222 Ill. 2d 495, 524, 857 N.E.2d 209, 226 (2006) (quoting *People v. Burpo*, 164 Ill. 2d 261, 266, 647 N.E.2d 996, 999 (1995)). As is pertinent to this case, a statute will be deemed impermissibly vague "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *City of Chicago v. Pooh Bah Enterprises, Inc.*, 224 Ill. 2d 390, 441-42, 865 N.E.2d 133, 165-66 (2006) (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).

¶ 92    Defendant, similar to his prior claim concerning the sufficiency of the indictment, claims section 24-3(A)(e) is unconstitutionally vague as applied to him because no person could understand the prohibition against the selling or giving of a firearm includes a prohibition against returning a firearm to its owner. We disagree. When measured by common understanding and practices, we find a person of ordinary intelligence can understand the prohibition against the selling or giving of a firearm to a person who has been a patient in a mental institution within the previous five years equally prohibits the return of a firearm to a person who has been a patient in a mental health institution within the previous five years. See *People v. Capitol News, Inc.*, 137 Ill. 2d 162, 171, 560 N.E.2d 303, 307 (1990) ("An impossible standard of preciseness of language and expression cannot be required; it is enough that the law's language and meaning are sufficiently definite when measured by common understanding and practices."). We find the purpose of the statute is readily conveyed by its plain language—to prevent persons from

knowingly giving firearms, regardless of how they are given, to persons who have been admitted to mental institutions for mental health treatment within the previous five years. Section 24-3(A)(e) is not unconstitutionally vague as applied to defendant. It is also not unconstitutional on its face. See, *e.g.*, *Molnar*, 222 Ill. 2d at 529.

¶ 93       We find the indictment is not based upon a statute that is unconstitutionally vague and the trial court did not err in denying defendant's pretrial motion to dismiss the indictment on this basis.

¶ 94                B. The Denial of the Motion for a Directed Finding

¶ 95       Defendant argues the trial court erred by denying his motion for a directed finding at the close of the State's case. Defendant maintains a directed finding of not guilty should have been entered because the State failed to present any evidence showing he knew Travis was a "patient in a mental institution" as it has been statutorily defined.

¶ 96       The State asserts the issue is forfeited and should not be considered because defendant did not renew his motion after presenting his own evidence. While the State's assertion has merit, we decline the State's invitation to not consider the issue. See *People v. Cazacu*, 373 Ill. App. 3d 465, 473, 869 N.E.2d 381, 389 (2007) ("It is well settled that if a defendant chooses to present evidence following the denial of his motion for a directed finding at the close of the State's evidence, he waives any error resulting from the trial court's ruling on the motion unless he renews his motion at the close of all evidence."). Defendant raised the issue in his posttrial motion, the State responded to it, and the trial court addressed it on the merits. Under these circumstances, we will consider the issue. See *People v. Raney*, 2014 IL App (4th) 130551, ¶ 33, 8 N.E.3d 633 ("[F]orfeiture of an issue is a limitation on the parties and not on this court.").

¶ 97　　　　A motion for a directed finding asserts "only that as a matter of law the evidence is insufficient to support a finding *** of guilty." *People v. Withers*, 87 Ill. 2d 224, 230, 429 N.E.2d 853, 856 (1981); see 725 ILCS 5/115-4(k) (West 2016). "The making of it requires the trial court to consider only whether a reasonable mind could fairly conclude the guilt of the accused beyond reasonable doubt, considering the evidence most strongly in the [State's] favor." *Withers*, 87 Ill. 2d at 230. The issue of whether a directed finding should have been entered is a question of law, subject to *de novo* review. *Cazacu*, 373 Ill. App. 3d at 473.

¶ 98　　　　In order to prove defendant guilty of unlawful delivery of a firearm, as charged in this case, the State had to establish, amongst other things, defendant knew Travis was a "patient in a mental institution" as it has been statutorily defined. See 720 ILCS 5/24-3(A)(e) (West 2016). Specifically, the State had to establish defendant knew Travis was admitted to a qualifying mental institution for mental health treatment. *Id.*

¶ 99　　　　"Knowledge of a material fact includes awareness of the substantial probability that the fact exists." *Id.* § 4-5(a). Determining "whether a person acted with knowledge may be inferred from circumstantial evidence." *People v. White*, 2016 IL App (2d) 140479, ¶ 37, 59 N.E.3d 156. "Circumstantial evidence is proof of certain facts and circumstances from which the trier of fact may infer other connected facts that human experience dictates usually and reasonably follow." *Id.*

¶ 100　　　　By the close of its case, the State had presented evidence showing defendant knew Travis was admitted to the Behavioral Health Unit at UnityPoint, a qualifying mental institution, from May 27 to June 3, 2016. The State presented testimony showing defendant was with Travis in the late hours of May 26, 2016, immediately before he was taken to UnityPoint. With respect to the circumstances of May 26, 2016, the State specifically presented testimony showing Travis was

having an apparent mental-health crisis in a CVS parking lot while defendant was nearby. The law enforcement officers who were at the scene testified to Travis yelling statements about the entertainer Taylor Swift stalking him and hacking his electronic devices. The officers also testified to having discussions with Travis's family members. Trooper Mancha specifically testified he suggested to "[e]veryone who was there" that Travis needed mental-health assistance and later explained to Travis's family, including defendant, that Travis was going to UnityPoint "because they have a mental[ ]health facility there." Trooper Mancha also advised Travis's family not to entertain Travis's delusions. From this evidence, we find a reasonable mind could fairly conclude defendant knew Travis's admission at UnityPoint was "for mental health treatment." We find a reasonable mind could fairly conclude defendant knew Travis was a "patient in a mental institution" as it has been statutorily defined.

¶ 101          We find defendant was not entitled to a directed finding of not guilty at the close of the State's case and the trial court did not err in denying defendant's motion for such a finding.

¶ 102                          C. The Finding of Guilt

¶ 103          Defendant argues the trial court erred by finding him guilty at the close of trial. Defendant maintains he should have been found not guilty because no rational trier of fact could have found he knew Travis was a "patient in a mental institution," as it has been statutorily defined.

¶ 104          When presented with a challenge to the sufficiency of the evidence, "the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis and internal quotation marks omitted.) *People v. McLaurin*, 2020 IL 124563, ¶ 22, 162 N.E.3d 252. The trier of fact, in this case the trial court, "remains responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts."

*People v. Harris*, 2018 IL 121932, ¶ 26, 120 N.E.3d 900. "A criminal conviction will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Gray*, 2017 IL 120958, ¶ 35, 91 N.E.3d 876.

¶ 105     In support of his argument, defendant initially emphasizes his testimony about his hearing difficulties, as well as his assertions he could not hear the officers in the CVS parking lot, he was not told by anyone where Travis was being taken, he was not notified of the involuntary commitment proceeding involving Travis, and he was never told nor inquired about the reason for Travis being at the hospital. Defendant essentially asks this court to retry him and accept his version of events, which we may not do. The trial court, which was in a better position to evaluate the witnesses, made credibility determinations and rejected defendant's version of events. The court's determinations find support in the record.

¶ 106     Ultimately, this court, viewing the evidence in the light most favorable to the State, finds sufficient evidence to prove defendant knew Travis was a "patient in a mental institution." In addition to the incriminating information gleaned from the evidence presented as part of the State's case highlighted above, incriminating information is gleaned from defendant's testimony. First, defendant acknowledged hearing Travis complaining about his phone being hacked by Taylor Swift and calling ERS. A reasonable inference, setting aside defendant's self-serving and questionable explanation for placing the call, is defendant called ERS believing Travis was having a mental health crisis and needed mental health treatment. In addition, defendant acknowledged repeatedly visiting Travis in the behavioral health unit. A reasonable inference, again setting aside defendant's self-serving testimony, is defendant knew Travis was receiving mental health treatment while in the behavioral health unit.

¶ 107　　　　We find a rational trier of fact could find defendant knew Travis was a "patient in a mental institution," as it has been statutorily defined at the close of trial, and the trial court did not err in finding defendant guilty of the charged offense.

¶ 108　　　　D. The Rejection of the Posttrial Claim of Ineffective Assistance

¶ 109　　　　Defendant argues the trial court erred by rejecting his posttrial claim of ineffective assistance of counsel. Defendant maintains Attorney Sullivan provided ineffective assistance by (1) agreeing to the trial stipulations, (2) failing to present certain defenses, and (3) failing to prepare him to testify at trial.

¶ 110　　　　"Every defendant has a constitutional right to the effective assistance of counsel under the sixth amendment to the United States Constitution and the Constitution of Illinois." *People v. Domagala*, 2013 IL 113688, ¶ 36, 987 N.E.2d 767. Claims of ineffective assistance of counsel are analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Domagala*, 2013 IL 113688, ¶ 36. To prevail on a claim of ineffective assistance, a defendant must show both (1) "counsel's performance was objectively unreasonable under prevailing professional norms" and (2) "there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694).

¶ 111　　　　Where, as in this case, a trial court has ruled on a defendant's claim of ineffective assistance following an evidentiary hearing where findings of fact were made, our review is bifurcated: we defer to the court's findings of fact unless they are against the manifest weight of the evidence, but we assess *de novo* the ultimate legal issue of whether counsel's acts or omissions constitute ineffective assistance. *People v. Walker*, 2021 IL App (4th) 190073, ¶ 29, 188 N.E.3d 1235; *People v. Alfaro*, 386 Ill. App. 3d 271, 312, 896 N.E.2d 1077, 1112 (2008). "A finding is

against the manifest weight of the evidence where the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." (Internal quotation marks omitted.) *People v. Peterson*, 2017 IL 120331, ¶ 39, 106 N.E.3d 944. This deferential standard "is grounded in the reality that the [trial] court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony." (Internal quotation marks omitted.) *People v. Radojcic*, 2013 IL 114197, ¶ 34, 998 N.E.2d 1212.

¶ 112 We begin with defendant's contention Attorney Sullivan provided ineffective assistance by agreeing to the trial stipulations. Defendant maintains Attorney Sullivan's decision to agree to the stipulations amounts to ineffective assistance because he objected to the stipulations and the decision to stipulate was not a matter of trial tactics and strategy.

¶ 113 Our supreme court has held defense counsel may, with a limited exception not applicable to this case, "validly waive a defendant's right of confrontation" by entering into an evidentiary stipulation "where two elements are met: (1) the defendant does not object to the stipulation; and (2) the decision to stipulate is a matter of trial tactics and strategy." (Emphasis omitted.) *People v. Clendenin*, 238 Ill. 2d 302, 324, 939 N.E.2d 310, 323 (2010) (citing *People v. Campbell*, 208 Ill. 2d 203, 217, 802 N.E.2d 1205, 1213 (2003)).

¶ 114 Defendant claims he, contrary to the finding of the trial court, objected to the stipulations and, therefore, Attorney Sullivan should not have agreed to them. We disagree. Initially, defendant highlights evidence favorable to his claim and asserts the court either ignored or failed to consider his evidence. Defendant's assertion is refuted by the record. The court made clear it considered all of the evidence before it. Defendant also, in support of his claim, emphasizes the evidence of his undisputed objection to the stipulations in January 2022 and suggests that

evidence is sufficient to preclude Attorney Sullivan from agreeing to the stipulations. Defendant fails to cite, however, any authority for his suggestion, and, moreover, we find it at odds with the realities of the pretrial practice of law. Indeed, it is entirely reasonable to believe, as Attorney Sullivan testified to in this case, a defendant may initially object to a stipulation and then withdraw the objection after further consultation.

¶ 115        The trial court was presented with conflicting evidence at the hearing on the posttrial motion as to whether defendant objected to the stipulations tendered at his trial. We cannot say the court's factual finding defendant did not object to the stipulations is against the manifest weight of the evidence. Attorney Sullivan testified defendant did not object to the stipulations when they discussed them. Additionally, defendant, despite the fact the stipulations were repeatedly addressed in open court at trial, did not voice any objection. Based upon the evidence presented, the opposite conclusion is not clearly evident, nor is the court's finding unreasonable, arbitrary, or not based on the evidence. The finding defendant did not object to the stipulations, therefore, stands.

¶ 116        Defendant also claims, contrary to the finding of the trial court, that Attorney Sullivan's decision to agree to the stipulations was not a matter of trial tactics and strategy and, therefore, he should not have agreed to the stipulations. We disagree. Initially, defendant highlights the absence of any evidence of some of the stipulated facts and suggests the absence of this evidence shows Attorney Sullivan's decision to agree to the stipulations was not a matter of trial tactics and strategy. Defendant's suggestion, however, is a nonstarter; the stipulations were, undisputedly, sufficient to establish the facts set forth therein, thereby obviating any need to produce additional evidence of those facts. Defendant also, in support of his claim, asserts Attorney Sullivan's decision to stipulate to the fact he "gave" the firearm to Travis could not have been a

matter of trial tactics and strategy, given the argument he raised before the court on that issue. Defendant fails to recognize, however, that Attorney Sullivan testified his argument was intended to simply preserve those issues raised in the pretrial motion to dismiss the indictment.

¶ 117    Attorney Sullivan testified he decided to agree to the stipulations because he believed the facts therein were easily provable and he wanted to avoid live witness testimony establishing some of those facts. In effect, Attorney Sullivan wanted to focus the trial on the theory of defense which he believed would be most successful—that defendant did not know Travis's admission to UnityPoint was for mental health treatment. Attorney Sullivan's decision to agree to the stipulations was, therefore, a matter of trial tactics and strategy. See, *e.g.*, *People v. Phillips*, 217 Ill. 2d 270, 285, 840 N.E.2d 1194, 1203 (2005).

¶ 118    We find, applying the analytical approach set forth by our supreme court for stipulations, Attorney Sullivan was permitted to waive defendant's right of confrontation by entering into the stipulations, and the decision to do so did not amount to constitutionally deficient performance. We further find, although only addressed by defendant in passing, an absence of prejudice from the decision to agree to the stipulations. Attorney Sullivan testified to his belief the facts set forth in the stipulations were easily provable. Defendant did not present any evidence showing Attorney Sullivan's belief was erroneous. As for the stipulation to the fact defendant "gave" the firearm to Travis, we likewise find an absence of prejudice where, as indicated above, the statutory language prohibiting the giving of a firearm applied equally to the return of a firearm. We reject defendant's contention that Attorney Sullivan provided ineffective assistance by agreeing to the stipulations.

¶ 119    Next, we consider defendant's contention that Attorney Sullivan provided ineffective assistance by failing to present certain defenses. Defendant maintains Attorney

Sullivan's failure to present defenses based upon the advice he received from the Tazewell County Sheriff's Office and the failure of others to properly report Travis's involuntary commitment to the Illinois State Police amounts to ineffective assistance.

¶ 120        It is well established that " '[t]he decision to rely on one theory of defense to the exclusion of other theories of defense is a matter of trial strategy.' " *People v. Hayes*, 2022 IL App (4th) 210409, ¶ 52, 217 N.E.3d 327 (quoting *People v. Clark*, 207 Ill. App. 3d 439, 450, 565 N.E.2d 1373, 1380 (1991)). Furthermore, as our supreme court has made clear, a reviewing court must be "highly deferential to trial counsel on matters of trial strategy, making every effort to evaluate counsel's performance from his perspective at the time, rather than through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344, 864 N.E.2d 196, 216 (2007).

¶ 121        At the hearing on the posttrial motion, Attorney Sullivan was examined at length about the defense strategy. He indicated he considered potential defenses based upon the advice defendant received from the Tazewell County Sheriff's Office and the failure of others to properly report Travis's involuntary commitment to the Illinois State Police. He ultimately decided to forego those potential defenses for other ones. Defendant does not dispute the defenses Attorney Sullivan pursued, although unsuccessful, were valid. On this record, we conclude Attorney Sullivan made a reasonable strategic decision to pursue certain theories of defense to the exclusion of others.

¶ 122        Accordingly, we find Attorney Sullivan was permitted to pursue certain theories of defense to the exclusion of others and the decision to do so did not amount to constitutionally deficient performance. We further find, although again only addressed by defendant in passing, an absence of prejudice from the decision to not to pursue the additional defenses. Defendant asserts, had Attorney Sullivan submitted the additional defenses, this "case could have ended with an

acquittal." This assertion is far from establishing the requisite prejudice to support a claim of ineffective assistance. We reject defendant's contention that Attorney Sullivan provided ineffective assistance by failing to present certain defenses.

¶ 123     Last, we consider defendant's contention that Attorney Sullivan provided ineffective assistance by failing to prepare him to testify at trial. Defendant maintains Attorney Sullivan's failure to prepare him to testify amounts to ineffective assistance.

¶ 124     As previously stated, a defendant must show counsel's performance was objectively unreasonable under prevailing professional norms to prevail on a claim of ineffective assistance. *Domagala*, 2013 IL 113688, ¶ 36.

¶ 125     At the hearing on the posttrial motion, Attorney Sullivan testified he and defendant discussed the defense strategy and defendant had told him a "consistent story." Attorney Sullivan further testified he believed defendant "could certainly repeat the story that we've talked about ad nauseam a number of times." Defendant did not dispute this testimony. The evidence, therefore, showed Attorney Sullivan had, in fact, prepared defendant to testify and he did so by repeatedly reviewing the story defendant would tell and discussing the defense strategy.

¶ 126     We find Attorney Sullivan prepared defendant to testify, and the manner in which he did so did not amount to constitutionally deficient performance. In fact, defendant does not allege what else he believes counsel should have done to prepare him to testify. We reject defendant's contention that Attorney Sullivan provided ineffective assistance by failing to prepare him to testify at trial.

¶ 127     In sum, the trial court did not err by rejecting defendant's posttrial claim of ineffective assistance of counsel.

¶ 128          E. The Performance of the Trial Court and the State

¶ 129 As a final matter, we commend both the trial court and the State for their performances in this case. The State, both below and on appeal, provided concise written argument addressing the contested issues. The court, in turn, issued detailed written orders addressing and resolving the contested issues. The performances of both demonstrate this case has been given careful and thorough consideration at all stages of the proceedings.

¶ 130                                     III. CONCLUSION

¶ 131 For the reasons stated, we affirm the trial court's judgment.

¶ 132 Affirmed.

*People v. Reinking*, 2024 IL App (4th) 230486

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Tazewell County, No. 19-CF-145; the Hon. Christopher R. Doscotch, Judge, presiding. |
| **Attorneys for Appellant:** | Michael Doubet, of Peoria, for appellant. |
| **Attorneys for Appellee:** | Kevin E. Johnson, State's Attorney, of Pekin (Patrick Delfino, David J. Robinson, and Matthew S. Goldman, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |