2026 IL App (2d) 250006-U
No. 2-25-0006
Order filed April 6, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,
v. KEON D. FUNCHES, Defendant-Appellant.

Appeal from the Circuit Court of Kane County.
Honorable Julia A. Yetter, Judge, Presiding.
No. 22-CF-1727

JUSTICE BIRKETT delivered the judgment of the court.
Presiding Justice Kennedy and Justice McLaren concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant failed to establish ineffective assistance of trial counsel and the trial court properly conducted its *Batson* analysis.

¶ 2    Defendant, Keon D. Funches, was convicted of being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2022)) and unlawful possession of a weapon as a felon (*id.* § 1.1(a)). On appeal, he argues that his trial counsel was ineffective and that the trial court improperly collapsed its *Batson* analysis. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    On November 2, 2022, a grand jury indicted defendant for being an armed habitual criminal (*id* § 1.7(a)), four counts of unlawful possession of a weapon as a felon (*id.* § 1.1(a)), reckless

discharge of a firearm (*id.* § 24-1.5(a)), and disorderly conduct (*id.* § 26-1(a)(4)). On December 2, 2022, defendant pleaded not guilty to the charges.

¶ 5    On March 23, 2023, defendant moved to suppress certain statements he made to law enforcement as well as any evidence recovered during their search of his apartment. On April 19, 2023, the court held a hearing on the motion.

¶ 6    Defendant testified that, on September 13, 2022, he invited an individual he knew only as DeAndre—whom he had previously smoked cannabis with—into an apartment he shared with his girlfriend, Aliyah Griffin. In their bedroom, DeAndre shot defendant's hand. Defendant ran to a bathroom "to wrap [his] hand up" in a towel. While defendant was indisposed, DeAndre seemingly fled.

¶ 7    After the shooting, defendant called Griffin. She was concerned that listing her address in a police report could jeopardize her Section 8 housing benefits. To avoid that, she directed defendant to Dundee-Crown High School while she called an ambulance. There, defendant spoke with police officers and gave them descriptions of the alleged shooters. After he was admitted to the hospital, officers entered his apartment—apparently without his or Griffin's permission—and found DeAndre's gun.

¶ 8    After defendant testified, the State called Officers Thomas Crowe and Scott Blahnik to describe their respective encounters with him shortly after the shooting and before his arrest. The court then reviewed body camera footage from both officers. In footage from Officer Crowe's camera, Griffin clearly gives the officers permission to enter her apartment and to search for a weapon. Soon after, an officer spots a handgun sitting on top of a kitchen cabinet.

¶ 9    On May 26, 2023, the court found that Griffin, a tenant of the apartment, had actual authority to consent to a search of the apartment. Because she had properly exercised that authority, the search was lawful and the court denied the motion to suppress.

¶ 10    On October 5, 2023, the parties appeared and set the matter for trial. The State informed the court that it was withdrawing its prior offers for a sentence below the statutory minimum. Defendant acknowledged that the State would revoke the offers if he proceeded to trial.

¶ 11    On February 1, 2024, the parties appeared for a final pretrial conference. The State presented a motion *in limine* to allow evidence of defendant's prior convictions should he choose to testify. Following argument, the court granted the motion in part, allowing the State to introduce only two of defendant's prior convictions in such circumstances.

¶ 12    Defendant presented his own motion *in limine* to exclude certain DNA evidence recovered from the handgun, arguing that the State had failed to provide him with that evidence prior to trial. The State acknowledged that it would not be able to provide its full DNA evidence packet under Illinois Supreme Court Rule 417 (eff. Mar. 1, 2001) until the following day but maintained that it had emailed the relevant materials to trial counsel days earlier, on January 29, 2024. Trial counsel, on the other hand, remained firm that she had not received those materials. The court denied the motion to bar the evidence but ruled that, once defendant received the materials, it would grant any necessary continuances to ensure trial counsel adequate preparation time.

¶ 13    On February 5, 2024, the parties began jury selection. During *voir dire*, the court asked Juror No. 41 whether she or anyone close to her had been charged with or convicted of a crime. She indicated that she had previously been charged with driving under the influence, and that a prior partner had been convicted of battery of a police officer. Upon further questioning, she also

provided that she had previously been the victim of domestic battery, and that a family member had been the victim of a theft.

¶ 14 The State next questioned Juror No. 41:

"Q. When you were filling out the juror questionnaire, some of the information you have provided was not included.

Were you, I guess, in a rush to fill it out or—

A. Pardon?

Q. Were you in a rush to fill it out or—

A. No."

Following the exchange, the State exercised a peremptory challenge to excuse Juror No. 41. Trial counsel requested a sidebar, stating, "Judge, I guess I don't know if this would be termed a *Batson* challenge, but I don't think she had any real reason to excuse [Juror No. 41], and she's the only one that's a minority that we've had on the panel. So I would object."

¶ 15 The court observed that, "based on her name and her appearance," Juror No. 41 appeared "to be of an ethnicity that is considered a minority." It asked the State whether it had a "neutral reason" for the exclusion. The State responded, "Yes. She gave the Court various answers to people being convicted, charged, and family members being victims of crime that were not included on her questionnaire. And that was the basis, that she wasn't honest when she was filling out the questionnaire."

¶ 16 Defendant suggested that Juror No. 41 was merely confused while completing the questionnaire. The court, however, noted the discrepancies between Juror No. 41's *voir dire* responses and the questionnaire before finding that the State had provided a "race-neutral reason" for the exclusion. It therefore denied defendant's objection.

¶ 17 The matter proceeded to trial. During opening statements, trial counsel referenced the DNA evidence:

> "And then you're going to hear from four forensic scientists. This is where the evidence comes in with the DNA and the blood.
>
> So you know, the DNA, they find DNA on the gun. So they test the gun, and they don't find [defendant's] DNA on it, okay?"

The State objected. The parties approached the bench, where the State clarified that it "wanted to make sure [trial counsel] had an opportunity to review the DNA" evidence, because—contrary to trial counsel's assertions—the gun and bloody bedsheets from the apartment contained defendant's DNA. The court asked trial counsel whether she had examined the evidence. She responded, "The report [the State] gave me last week says that it didn't, didn't it, or was it just on the ridge? Maybe it was the ridge of the gun. Maybe I should specifically say that, that they found his DNA on the ridge."

¶ 18 The court informed trial counsel that it was "not saying [she] did anything incorrect," but inquired whether she had access to the DNA evidence. She explained that she must have misremembered the report. The court overruled the State's objection. After trial counsel confirmed with the State that it did not recover defendant's fingerprints on the gun, trial counsel finished her opening statement.

¶ 19 The State presented evidence showing that, on September 13, 2022, Officer Crowe approached defendant and Griffin outside of Dundee-Crown High School. Defendant, whose left hand was wrapped in a gray towel, informed Crowe that two former gang affiliates—"Black Man" and "Little Tim"—had shot him while he was walking from the Fox View Apartments to a nearby gas station. According to defendant, the individuals then drove off in a red Chevrolet Impala.

Defendant purportedly grabbed a towel from a nearby porch and wrapped his hand before finding Crowe.

¶ 20    Crowe then traveled to the Fox View Apartments. During a review of their security footage, he recognized defendant standing outside of a unit with his hand already wrapped in the gray towel. He and another officer later found drops of blood outside of that unit. While they inspected the blood, Griffin approached the officers from across the street and allowed them into the apartment, where they located a Springfield XD semiautomatic handgun on top of a kitchen cabinet. Griffin told officers that, earlier that day, she had cleaned up blood found inside the apartment and discarded the cleaning materials in a dumpster outside.

¶ 21    Detective Derek Neuman arrived at the apartment to recover the handgun, which was still loaded with a round in its chamber. A "blood[-]like substance" dotted the rear of the gun slide. In a bedroom, Neuman found what appeared to be blood on a mattress, the floor, and a wall. Upon a closer examination, he located more blood splatter in a closet along with paint flakes and debris. Garments hanging in the closet also had splatter and, in some cases, holes that Neuman deduced were caused by a bullet. Eventually, Neuman noticed a "gouge" in the wall with portions of a projectile resting underneath.

¶ 22    Neuman moved outside to the dumpster where Griffin had thrown away the bloody cleaning supplies. He located a garbage bag that contained a bloody bed sheet, orange sandals, and garbage. The bed sheet's pattern matched pillowcases that were earlier found in the bedroom.

¶ 23    Paramedics transported defendant to Sherman Hospital, where he was met by Officer Blahnik, who swabbed his right hand and arm for gunshot residue. He also attempted to swab defendant's left hand, but had some difficulty given defendant's wound. Afterwards, Officer Blahnik administered a questionnaire to defendant, who denied firing any weapon.

¶ 24    Several forensic scientists for the Illinois State Police tested the evidence recovered from the apartment. Shaya Daniels, an expert in latent fingerprints, was unable to find any latent fingerprints on the recovered handgun, magazine, or live round. Upon receiving the handgun, she noted that it was coated with a "greasy" substance, which "[p]otentially" thwarted her efforts to recover prints. Julie Steele, an expert in firearms identification, could neither confirm nor deny that the recovered projectile was fired from the Springfield XD handgun. Like Daniels, Steele noted a substance—which she took for lubricant—coating the gun. Heather May, an expert in forensic DNA analysis, found that DNA recovered from the handgun's grip matched defendant's DNA profile. Such a genetic profile would be expected to occur in approximately 1 out of 340 nonillion individuals. She had not tested the blood-like material from the gun's slide or its trigger and could not determine whether the gun contained any other individual's DNA. She had found, however, "very strong support that [defendant was] a contributor to the DNA profile" located on the bed sheet.

¶ 25    Kevin Gillespie, another forensic scientist, tested defendant's gunshot residue kit. He concluded that defendant "either discharged a firearm, was in the environment of a discharged[ ]firearm," or touched another item containing gunshot residue. Following Crowe's testimony, the court informed the parties that the State Police had tendered it with the aforementioned Illinois Supreme Court Rule 417 packet. Both parties acknowledged receiving physical copies of the packet.

¶ 26    After presenting its witnesses, the State introduced certified copies of two of defendant's prior convictions: a 2014 conviction for robbery (720 ILCS 5/18-1(a) (West 2014)) and a 2022 conviction for unlawful use of a weapon by a felon (*id.* § 24-1.1(a)). The State rested its case. Defendant moved for a directed verdict, which the court denied.

¶ 27    The court admonished defendant that it was "[his] decision and [his] decision alone whether or not to testify" and asked whether he "had enough time to speak with [his] attorney" to make a decision. Defendant agreed that he had and elected not to testify. Following closing arguments, the jury found defendant guilty of being an armed habitual criminal and for unlawful possession of a weapon by a felon. However, the jury found defendant not guilty of reckless discharge of a firearm or disorderly conduct.

¶ 28    On March 13, 2024, trial counsel filed an untimely motion for a new trial, arguing that the State had failed to meet its burden in proving defendant had possessed a gun. Additionally, trial counsel argued that her own ineffective assistance—specifically, her failures to timely review the DNA evidence and to call defendant to testify—warranted a new trial. The court agreed to entertain defendant's motion despite its tardiness.

¶ 29    On March 15, 2024, the court held a hearing on the motion. It advised trial counsel that there would be a clear conflict of interest if she were to argue her own ineffectiveness, and that, as a result, defendant would need a new attorney to pursue the motion. Ultimately, it appointed defendant new counsel.

¶ 30    On August 19, 2024, defendant filed an amended motion for a new trial through his new posttrial counsel. In it, he argued that his trial counsel had been ineffective for failing to: (1) stipulate to the offenses underlying defendant's charges for unlawful possession of a weapon as a felon and being an armed habitual criminal; (2) request adequate time to review the DNA evidence; and (3) present any cohesive defense strategy—such as the version of events involving DeAndre. Additionally, defendant argued that trial counsel's cumulative errors throughout the proceedings established her ineffective assistance.

¶ 31    On October 9, 2024, the court held a hearing on the amended motion. Defendant testified that trial counsel never informed him of his right to choose whether to testify at trial, although he later acknowledged receiving admonitions from the court regarding the same. He further testified that he did not learn of the DNA evidence until the first day of trial. On November 8, 2024, the court denied the amended motion. On December 20, 2024, the court merged defendant's convictions and sentenced him to eight years' incarceration. Defendant timely appeals.

¶ 32                              II. ANALYSIS

¶ 33    Defendant argues that the court erred in denying his motion for a new trial because trial counsel failed to: (1) present a viable defense or alibi; (2) adequately review the DNA evidence; and (3) stipulate to prior convictions. Defendant further argues that trial counsel's cumulative deficiencies warrant a new trial, and that the trial court conducted an improper *Batson* analysis.

¶ 34                          A. Ineffective Assistance

¶ 35    Here, because trial counsel's alleged shortcomings amounted to strategy or caused no prejudice, we disagree that her representation was ineffective. Both the United States and Illinois Constitutions guarantee criminal defendants the right to effective assistance of counsel. U.S. Const., amend. VI, XIV; Ill. Const. 1970, art. I, § 8. We address claims of ineffective assistance under the familiar two-pronged standard set in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Johnson*, 2021 IL 126291, ¶ 52. Under this standard, a defendant must demonstrate that their trial counsel's performance fell below an objective standard of reasonableness and that the deficient performance resulted in prejudice. *Strickland*, 466 U.S. at 687-88. Where, as here, a trial court has ruled on a claim of ineffective assistance following an evidentiary hearing, our review is bifurcated. *People v. Reinking*, 2024 IL App (4th) 230486, ¶ 111. "[W]e defer to the court's findings

of fact unless they are against the manifest weight of the evidence, but we assess *de novo* the ultimate legal issue of whether counsel's acts or omissions constitute ineffective assistance." *Id.*

¶ 36                                        1. Viable Defense

¶ 37    First, because trial counsel's decision not to call defendant as a witness was based on strategy, it did not amount to deficient performance. "To establish deficient performance, [a] defendant must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy." *People v. Neasom*, 2017 IL App (1st) 143875, ¶ 42. Strategic decisions are "virtually unchallengeable" and will generally not support claims of ineffective assistance of counsel. *Id.* (quoting *People v. Walton*, 378 Ill. App. 3d 580, 589 (2007). Further, while criminal defendants hold a fundamental right to testify on their own behalf, such a decision should be made with the advice of counsel. *People v. Knapp*, 2020 IL 124992, ¶ 46.

¶ 38    Here, defendant argues that his trial counsel was deficient for failing to present jurors with the version of events he outlined in his March 23, 2023, motion to suppress—that an individual named DeAndre had shot him in the apartment before fleeing. According to defendant, "[b]y failing to present this available alternative narrative, counsel left the State's version of events entirely unopposed, denying the jury of a viable alternative explanation as to why [defendant's] DNA was on the gun and bed sheets and [why] his hands came into contact with gunshot residue." Essentially, by failing to call him as a witness, defendant argues that trial counsel violated her duty to present exculpatory evidence.

¶ 39    We disagree. As an initial matter, we note that the trial court admonished defendant that it was his and his right alone to decide whether to testify after the State finished presenting its evidence. Defendant nonetheless confirmed that he would not testify. Thus, the record rebuts his allegations "that his decision not to testify was *** based on allegedly erroneous advice from

counsel." *Knapp*, 2020 IL 124992, ¶ 54. Additionally, by failing to make any contemporaneous assertion of his right to testify, defendant has failed to preserve the matter. *Id.* ¶ 46 ("To preserve the right to testify, a criminal defendant is required to make a 'contemporaneous assertion' of that right' " at trial) (citing *People v. Enis*, 194 Ill. 2d 361, 399 (2000)).

¶ 40    Even more, defendant's suggestion that trial counsel failed to present *any* cogent trial strategy is rebutted by the record. While arguing his amended motion for a new trial, defendant acknowledged that he had repeatedly spoken with trial counsel about her "trial strategy" to challenge the State's ability to prove his guilt beyond a reasonable doubt. Utilizing this strategy, the jury acquitted defendant of both the reckless discharge and disorderly conduct charges, despite the presence of his DNA on the grip of the recovered handgun and the multitude of evidence indicating that a gun was recently fired into the closet. Thus, the record shows that trial counsel did provide defendant with a viable defense.

¶ 41    Further, trial counsel's decision to forgo calling defendant as a witness was sound strategy. Defendant's proposed testimony—that the enigmatic DeAndre shot him before apparently hiding his own gun in the apartment and disappearing—was inherently incredible and contradicted by the presence of defendant's DNA on the handgun's grip, which DeAndre would have necessarily been holding during the shooting. In either event, even if the jury accepted defendant's version of events, it still could have concluded that he knew of the firearm's presence in the apartment after the shooting, thereby satisfying the State's theory of constructive possession. See *People v. Hines*, 2021 IL App (1st) 191378, ¶ 32 (constructive possession requires a defendant's knowledge of a firearm in an area that he controls).

¶ 42    Moreover, had defendant taken the stand to present his alibi, he necessarily would have had to admit that he lied to police outside of Dundee-Crown High School about the drive-by

shooting, thereby admitting his guilt as to the disorderly conduct charge *while* undermining his credibility in front of the jury. Further, his testimony would open him up to impeachment, which would likely uncover additional unfavorable aspects of his criminal history before the jury. Thus, trial counsel's decision not to call defendant as a witness was a matter of strategy and not a failure to produce exculpatory evidence. Accordingly, defendant has failed to show ineffective assistance resulting from her performance.

¶ 43                                    2. DNA and Stipulations

¶ 44    Second, defendant's ineffective assistance claims relating to the DNA evidence and stipulations fail because he has not established prejudice. Regardless of deficient performance, we may dispose of an ineffective assistance claim where a defendant has failed to demonstrate any resulting prejudice. *People v. Perkins*, 2020 IL App (2d) 170963, ¶ 61. In the context of an ineffective assistance claim, a defendant is prejudiced where a reasonable probability exists that, but for counsel's errors, the proceeding would have resulted differently. *Id.*

¶ 45    Here, defendant argues that trial counsel's failure to obtain a continuance to review the DNA evidence prejudiced him because it undermined the jury's perception of her credibility and prevented her from compiling a coherent defense to rebut the State's theory of constructive possession. We disagree.

¶ 46    As a starting point, the record does not support defendant's suggestion that the jury was aware of trial counsel's misstatement. It is true that, in her opening argument, trial counsel prompted an objection by incorrectly telling jurors that scientists had not found defendant's DNA on the handgun. However, after the parties addressed the issue at the bench, away from the jury, the court overruled the State's objection and allowed trial counsel to continue with her opening statement. She did not correct her mistake. Given this resolution, the jury had no reason to doubt

trial counsel's competence. Further, even if the jury was made aware of trial counsel's single misstatement the next day after May's clarifying testimony, defendant points to no evidence that the revelation affected her credibility.

¶ 47    Moreover, because the DNA evidence was not instrumental to the State's case, defendant cannot show prejudice resulting from any alleged failure to adequately review it. Once more, the jury found defendant guilty of being an armed habitual criminal and unlawful possession of a weapon as a felon. "A person commits the offense of unlawful possession of a firearm by a repeat felony offender if he or she receives, sells, possesses, or transfers any firearm" after having been convicted twice of certain offenses. 720 ILCS 5/24-1.7(a). Further, to prove defendant guilty of unlawfully possessing a weapon as a felon, the State needed to show that defendant "knowingly possess[ed] on or about his person or on his land or in his own abode or fixed place of business any [prohibited] weapon *** or any firearm or any firearm ammunition if the person has been convicted of a felony under the laws of this State or any other jurisdiction."

¶ 48    "When a defendant is not found in actual possession of a firearm, the State must prove constructive possession." *Hines*, 2021 IL App (1st) 191378, ¶ 32. To establish constructive possession, the State must show that defendant had: (1) knowledge of the firearm; and (2) immediate and exclusive control over the area where the firearm was recovered. *Id.* "Knowledge may be shown by evidence of a defendant's acts, declarations, or conduct from which one can infer that he knew the contraband existed in the place where it was found." *Id.* "Control is established when [a] defendant has the 'intent and capability to maintain control and dominion' over an item, even if he lacks personal present dominion over it." *Id.* (quoting *People v. Frieberg*, 147 Ill. 2d 326, 361 (1992)). A defendant may constructively possess a firearm even when it is located in a space accessible to or shared by others. *Id.*

¶ 49    For example, in *Hines*, the First District found that the State proved constructive possession where it presented evidence showing that the defendant hid firearms behind an apartment dresser. *Id.* ¶ 35. There, the court found that the defendant had control over the apartment, given his presence in the unit and his failure to deny otherwise. *Id.* ¶ 34. The court found that his admission to police that he had placed the firearms behind the dresser further established his knowledge of their presence. *Id.* ¶ 33.

¶ 50    Here, a wounded defendant admitted to police that he resided at the Fox View Apartments. Officers reviewed footage of him standing outside the unit where they later discovered blood drops. Griffin reported cleaning additional blood inside, and officers recovered a bloody bedsheet in a dumpster that matched pillowcases from inside the apartment. Given defendant's admissions to police, his filmed presence at the apartment, and the bloody items tying him there, the State overwhelmingly proved his control over the premises without having to rely on the DNA evidence.

¶ 51    While in the apartment, officers plainly observed a firearm sitting on top of a kitchen cabinet, alongside a magazine and ammunition. Inside the bedroom closet, a detective discovered blood splatter, debris, a gouge in the wall, and projectile fragments. Officer Blahnik also recovered gunshot residue on defendant's right hand and arm soon after he made his report to police. Given defendant's fresh wound, these facts suggest that defendant was shot in the apartment, leaving little doubt that he knew of the gun's presence there. Thus, substantial evidence established defendant's constructive possession of the firearm, again, independent of the DNA evidence. Because the DNA results were merely cumulative to the other evidence establishing constructive possession, any additional review of May's findings by trial counsel would not have produced a more viable defense. Accordingly, defendant has not shown prejudice from trial counsel's failure to more thoroughly review the evidence.

¶ 52    Defendant also contends that trial counsel's failure to stipulate to his earlier convictions prejudiced him, because the State's resulting recitations of them caused the jury to convict him based on his criminal history alone. Defendant's assertion is speculative and unsupported by anything in the record. Again, the jury acquitted defendant of both reckless discharge and filing a false police report, despite his criminal history and the fact that May uncovered defendant's DNA on the grip of the gun. Moreover, despite defendant's assertions to the contrary, overwhelming evidence supported his convictions for being an armed habitual criminal and unlawful possession of a weapon as a felon. Accordingly, defendant failed to establish prejudice resulting from trial counsel's failure to stipulate to defendant's convictions.

¶ 53                                 3. Cumulative Error

¶ 54    Third, defendant alternatively argues that the cumulative effects of trial counsel's errors deprived him of a fair trial even if no single error could sustain a claim of ineffective assistance. Once more, we disagree. As discussed above, defense counsel's decision not to present defendant's alibi to the jury did not constitute deficient performance. Further, any prejudice resulting from her alleged failures to more adequately review the DNA evidence or to stipulate to defendant's convictions was minimal at best, given the overwhelming strength of the State's case. Once more, defendant's contentions to the contrary are speculative and lack basis in the record. Accordingly, we reject them.

¶ 55                                 B. *Batson* Analysis

¶ 56    Finally, because the trial court properly conducted its *Batson* analysis, we disagree that any remand for a new *Batson* hearing is necessary. The fourteenth amendment prohibits the State from exercising peremptory challenges on a racial basis. *Batson*, 476 U.S. 79, 89 (1986). The Supreme Court established a three-step process to determine whether the State has violated this prohibition.

*Id.* at 96-98. In the first step, a defendant must make a *prima facie* showing that the State has exercised a peremptory challenge based solely on race. *People v. Talley*, 2023 IL App (4th) 221013, ¶ 27. This initial burden is low; a defendant only needs to show enough facts to allow the court to infer discrimination. *People v. Shaw*, 2014 IL App (4th) 121157, ¶ 18. In determining whether a defendant has made a *prima facie* case, the court must consider the totality of the circumstances to see if they give rise to a discriminatory purpose. *Talley*, 2023 IL App (4th) 221013, ¶ 27. The findings need not be expressed where they may be inferred by the record. *Id.* ¶ 40.

¶ 57 Under the second step, the State must provide a race-neutral reason for the peremptory challenge. *Id.* ¶ 28. At this point, the defendant "may" rebut the proffered explanation as pretextual. *Id.* (citing *People v. Davis*, 231 Ill. 2d 349, 363 (2008)). However, "[s]o long as the State articulates race-neutral reasons for striking the prospective juror, the process moves to the third step." *Id.* Under the third step, the court must determine whether the defendant has shown purposeful discrimination. *Id.* ¶ 29. We review *de novo* the question of whether a trial court complied with *Batson*. *Id.* ¶ 23.

¶ 58 Defendant argues that the trial court failed to make a first-step finding of a *prima facie* case as well as an ultimate determination as to purposeful discrimination. As an initial matter, however, we briefly address the State's argument that defendant forfeited the issue by failing to include any *Batson* arguments in his amended posttrial motion. In *People v. Mitchell*, 152 Ill. 2d 274, 285 (1992), our supreme court found that the issue was preserved solely by raising a *Batson* objection during *voir dire*, and *Mitchell's* holding has been reiterated in non-capital contexts. *People v. Primm*, 319 Ill. App. 3d 411 (2000). Because the record shows defendant raised a *Batson* objection during *voir dire*, we consider his arguments.

¶ 59    The record establishes that the trial court complied with *Batson*. After the State excused Juror No. 41, defendant raised his *Batson* objection, noting that the juror was the only minority venireperson. The court agreed that Juror No. 41 appeared to be a minority before asking the State whether it had a race neutral reason for the exclusion. This early exchange reveals that defendant set forth his *Batson* claim, that the trial court independently considered it in conjunction with Juror No. 41's ethnicity, and determined that defendant made a *prima facie* showing of discrimination, leading it to move on to the next step. See *Talley*, 2023 IL App (4th) 221013, ¶ 40. Thus, the trial court properly conducted the first step of its *Batson* analysis.

¶ 60    The State then described the discrepancies in Juror No. 41's questionnaire as a basis for the exclusion, thus satisfying *Batson's* second step. After defendant responded to the argument, the court agreed with the State's suggestions that Juror No. 41's responses evinced a lack of candor. Having agreed with the State's race neutral reason for the exclusion, it denied defendant's objection, thereby finding no purposeful discrimination completing the third step under *Batson*. Accordingly, the trial court properly conducted each step of its *Batson* analysis, and defendant's argument to the contrary fails.

¶ 61                                    III. CONCLUSION

¶ 62    For the above reasons, we affirm the judgment of the circuit court of Kane County.

¶ 63    Affirmed.